**PUBLISH**
**UNITED STATES COURT OF APPEALS**
Filed 8/23/96
**TENTH CIRCUIT**

---

MUSTANG PRODUCTION
COMPANY, et al,

      Plaintiffs - Appellants,

    v.

ALTON HARRISON, et al,

      Defendants - Appellees.

and

WARD PETROLEUM
CORPORATION,

      Plaintiff - Appellant,

    v.

JUANITA LEARNED, et al,

      Defendants - Appellees.

No. 95-6287

No. 95-6292

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D. Ct. Nos. CV-88-1801 & CV-88-1954)**

---

Steven W. Bugg (Stanley L. Cunningham, with him on the briefs), McAfee & Taft, Oklahoma City, Oklahoma, appearing for the Appellants.

Melody L. McCoy, Native American Rights Fund, Boulder, Colorado, appearing

for Appellees.

Elizabeth Anne Peterson, Attorney, Department of Justice (Lois J. Schiffer, Assistant Attorney General, Bradley Scott Bridgewater and Edward J. Shawaker, Attorneys, Department of Justice, and Barbara Coen, Of Counsel, Office of the Solicitor, with her on the brief), appearing for amicus curiae United States of America.

---

Before TACHA, MCWILLIAMS, and MURPHY, Circuit Judges.

---

TACHA, Circuit Judge.

---

The issue in this case is whether the Cheyenne-Arapaho Tribes of Oklahoma ("the Tribes") may impose a severance tax on oil and gas production on allotted lands held in trust for their members. The appellants are nineteen oil and gas companies and one individual (collectively referred to as "Mustang") who hold oil and gas leases on the allotted lands. The appellees are members of the Business Committee and the Tax Commission, the tribal government entities responsible for promulgating and enforcing the tax at issue. The Cheyenne-Arapaho District Court ("the Tribal Court"), the Tribal Supreme Court, and the federal district court all held that allotted lands are subject to taxation by the Tribes. Mustang Fuel Corp. v. Hatch, 890 F. Supp. 995 (W.D. Okla. 1995) (district court opinion in this case). Our jurisdiction arises under 28 U.S.C. §1291, and we affirm.

## BACKGROUND

In 1865, the United States signed a treaty creating a reservation for the Tribes in western Oklahoma. An 1869 Executive Order implemented the treaty and delineated the boundaries of the reservation ("the 1869 reservation"). In 1890, the United States and the Tribes signed an Allotment and Cession Agreement ("the Agreement"), the subject of which was the land within the 1869 reservation as well as other land which had been mistakenly reserved to the Tribe by a treaty signed in 1867. The Agreement took effect by an Act of Congress on March 3, 1891 ("the Act").

Article I of the Act provided that the Tribes would cede to the United States all land mistakenly reserved to the Tribes in the 1867 treaty. Article II stated that, subject to the allotment of land to individual members of the Tribes, the Tribes would cede all land within the boundaries of the 1869 reservation. Article III provided allotments of land to all members of the Tribe "out of the lands ceded, conveyed, transferred, relinquished, and surrendered by Article II." The allotted lands were to be held in trust by the federal government for individual members of the Tribe. All of the allotted lands involved in this case continue to be held in trust.

In April 1988, the Tribes enacted a General Revenue and Taxation Act ("the Tax Act"), which taxes, among other things, oil and gas "produced, severed, saved, and removed from any land within the jurisdiction of the Cheyenne-

Arapaho Tribes of Oklahoma." Tax Act §§ 401 & 402. Taxpayers may pay under protest, in which case the disputed money is held in a separate account pending final resolution of their protest. Tax Act §118. After exhausting administrative remedies, a taxpayer may bring an action in tribal court to recover any taxes, penalties, or interest paid under protest or to enjoin the Tax Commission from collecting disputed revenues. Tax Act §§151-155.

The Tribes taxed Mustang for oil and gas that Mustang extracted on allotted lands pursuant to oil and gas leases. In 1988, Mustang filed this suit in federal district court challenging the Tribes' authority to tax oil and gas production on allotted lands. The court stayed the action pending Mustang's exhaustion of tribal remedies. In 1989, the Tribal Court held that allotted lands are "a part of the Cheyenne and Arapaho Indian reservation, and that said allotments are 'Indian Country' as the term is defined by federal law, and that said allotments are subject to taxation by the tribal government." The Tribal Supreme Court affirmed, and further held that Congress has not divested the Tribes of their inherent authority to tax activities that occur on allotted lands.

After Mustang exhausted its tribal remedies, the district court reopened the case and granted summary judgment in favor of the Tribes. The court held that allotted lands are Indian country, and thus subject to tribal jurisdiction and the Tribes' inherent authority to tax activities on tribal lands. Mustang, 890 F. Supp

at 1001-03. Mustang appeals, arguing that under the 1890 Agreement, the Tribe lost jurisdiction over all of the lands in the 1869 reservation, including lands allotted to individual tribal members.

## DISCUSSION

### I.      Standard of Review

This Circuit has never decided what standard a federal court should use to review a tribal court decision regarding tribal jurisdiction. The district court did not clearly articulate what standard it used to review the Tribal Supreme Court's ruling, but noted that the Tribal Supreme Court's decision was "helpful" in resolving the issue in this case. Id. at 999-1000. Mustang urges us to adopt the standard articulated by the Ninth Circuit in FMC v. Shoshone-Bannock Tribes, 905 F.2d 1311, 1313-14 (1990), which requires deference to a tribal court's findings of fact and de novo review of its conclusions of law.

In FMC, the Ninth Circuit relied on the Supreme Court's decision in National Farmers Union Insurance Co. v. Crow Tribe of Indians, 471 U.S. 845, 856-57 (1985), to determine the appropriate standard of review. Pointing to the Supreme Court's statement that "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court," id. at 856, the FMC court reasoned that a tribal court's factual findings should be reviewed for clear error, 905 F.2d at 1313. The Supreme Court further

stated in National Farmers Union that mandatory exhaustion of tribal court remedies is helpful because it provides other courts with the "benefit of their expertise." 471 U.S. at 857. The Ninth Circuit interpreted this to mean that while federal courts may be guided by a tribal court's expertise, they have no obligation to defer to a tribal court's decision, and thus legal questions should be reviewed de novo. FMC, 905 F.2d at 1313-14.

We are persuaded by the Ninth Circuit's analysis. We hold that when reviewing tribal court decisions on jurisdictional issues, district courts should review tribal courts' findings of fact for clear error and conclusions of law de novo. Although the district court was imprecise as to what standard it applied in this case, we are satisfied that the court deferred to the tribal court's findings of fact and reviewed de novo the legal question of tribal jurisdiction over allotted lands.

II.    Tribal Jurisdiction Over Allotted Lands

Mustang argues that the Tribes do not have authority over the allotted lands and thus cannot tax oil and gas production on those lands. Mustang contends that the Tribes lost jurisdiction over all of the lands in the 1869 reservation, including allotted lands, when the 1890 Agreement disestablished the reservation. According to Mustang, when the Agreement set aside allotted lands for individual tribal members, it also divested the Tribe of its jurisdiction over those lands.

As the district court correctly concluded, however, disestablishment of the reservation is not dispositive of the question of tribal jurisdiction. Mustang, 890 F. Supp. at 1001. In order to determine whether the Tribes have jurisdiction we must instead look to whether the land in question is Indian country. See Indian Country U.S.A. Inc. v. Oklahoma, 829 F.2d 967, 973 (10th Cir. 1987) ("[T]he Indian country classification is the benchmark for approaching the allocation of federal, tribal and state authority with respect to Indians and Indian lands."). Indian country encompasses those areas that have been "validly set apart for the use of the Indians as such, under the superintendence of the Government." Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 511 (1991) (quoting United States v. John, 437 U.S. 634, 648-49 (1978)).

In Oklahoma Tax Commission v. Sac and Fox Nation, 113 S. Ct. 1985, 1991 (1993), the Supreme Court specifically stated that "Indian allotments, whether restricted or held in trust by the United States," are Indian country. In that case, the state argued that members of the Sac and Fox Nation were subject to state taxation because an 1891 treaty disestablished their reservation. Id. at 1889. The Court rejected this argument and held that "a tribal member need not live on a formal reservation to be outside the State's taxing jurisdiction; it is enough that the member live in 'Indian country.'" Id. at 1991.

Mustang argues that Sac and Fox Nation does not apply because the issue

in that case was a state's, rather than a tribe's, civil jurisdiction.  We agree with the district court, however, that "[t]he issue is analogous--whether one government can tax citizens of another government engaging in activities on allotted lands."  Mustang, 890 F. Supp. at 1001.  "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories."  Potawatomi Indian Tribe, 498 U.S. at 509 (quoting Cherokee Nation v. Georgia, 5 Pet. 1, 17 (1881)).  The sovereign authority of Indian tribes includes the inherent power to tax non-Indians who conduct business on tribal lands and who benefit from governmental services provided by the tribes.  Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137, 140-41 (1982).  As discussed above, Indian tribes have jurisdiction over lands that are Indian country, and allotted lands constitute Indian country.  See DeCoteau v. District County Court, 420 U.S. 423, 446 (1975) (noting that allotments provide "an adequate fulcrum for tribal affairs" and that there is "exclusive tribal and federal jurisdiction" over allotted lands).  Thus, we agree with the district court that the Tribes have "an inherent sovereign power to tax economic activities on their lands, and because the allotted lands are within their jurisdiction, the Tribes have the power to enact and enforce a severance tax on oil and gas production from allotted lands."  Mustang, 890 F. Supp. at 1003.

Mustang argues that the Tribes would have authority over allotted lands

only if Congress passed an act specifically granting them jurisdiction, and that the Indian country statute, 18 U.S.C. § 1151 et. seq., grants criminal but not civil jurisdiction over allotted lands. The Indian country statute defines Indian country to include "all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151(c). Although the statute appears in Title 18, which deals primarily with crimes and criminal procedures, the Supreme Court has held that § 1151 applies to civil jurisdiction as well. DeCoteau, 420 U.S. at 427 n.2; see also Pittsburg & Midway Coal Mining v. Watchman, 52 F.3d 1531, n.10 (10th Cir. 1995) ("[T]he principle that § 1151 defines Indian country for both civil and criminal jurisdiction purposes is firmly established. Any suggestion to the contrary . . . is simply erroneous."). Thus, Mustang's argument that § 1151 does not apply to civil jurisdiction is incorrect, and the statute supports our conclusion that the Tribes have jurisdiction over the allotted lands.

The language of the 1891 Act, which ratified verbatim the agreement between the Tribes and the United States, also supports our conclusion. Article II of the Act provides:

> Subject to the allotment of land in severalty to the individual members of the Cheyenne and Arapaho tribes of Indians, as hereinafter provided for and subject to the conditions hereinafter imposed, for the considerations hereinafter mentioned the said Cheyenne and Arapaho Indians hereby cede, convey, transfer, relinquish, and surrender forever and absolutely, without any

reservation whatever, express or implied, all their claim, title and interest, of every kind and character, in and to the lands [in the 1869 reservation].

26 Stat. 989, 1022 (emphasis added). The "subject to the allotment of land" clause modifies the cession language and expressly conditions the cession of some lands on the allotment of other lands. In addition, the "subject to the allotment of lands" provision implicitly excludes the allotted lands from the ceded lands. Therefore, the comprehensive terms of the cession do not apply to the allotted lands.

> Article III of the Act describes the details of the allotment procedure:
>
> Out of the lands ceded, conveyed, transferred, relinquished, and surrendered by Article II hereof, and in part consideration for the cession of lands named in the preceding article, it is agreed by the United States that each member of the said Cheyenne and Arapaho tribes of Indians over the age of eighteen years shall have the right to select for himself or herself one hundred and sixty acres of land, to be held and owned in severalty . . . .

26 Stat. 989, 1023 (emphasis added). Mustang contends that because allotments were selected "out of the lands ceded," the allotted lands were ceded as well. This reading of the provision is incorrect. Article III merely describes who was entitled to allotments, identifies the land from which the allotments were to be selected, and describes the size of the allotments--it says nothing about which land is ceded, a subject covered in Articles I and II. Article I unconditionally cedes the land that was mistakenly reserved to the Tribes. Article II cedes the

land in the 1869 reservation, but not unconditionally: the cession in Article II is subject to allotment. The plain language of the Act indicates that while the allotted lands were selected from the lands ceded, the allotted lands themselves were not ceded. Instead, the allotted lands were set aside for the use of the Indians, remaining part of Indian country even after the reservation was disestablished.

In conclusion, we hold that the allotted lands constitute Indian country over which the Tribes have civil jurisdiction. Thus, the Tribes have the power to enact and enforce a severance tax on oil and gas produced on allotted lands. Accordingly, the decision of the district court is AFFIRMED.