BRISCOE, Circuit Judge, dissenting:
I respectfully dissent. For the reasons outlined below, I conclude the Navajo Indian Nation lacks authority to impose the challenged Hotel Occupancy Tax on Appellant’s non-Indian guests, and would reverse and remand with directions to enter judgment in favor of Appellant.
I.
Although the majority has recited a few of the historical facts giving rise to this dispute, it has downplayed the chain of events that led to Appellant’s land falling within the exterior boundaries of the Nation’s reservation. Further, the majority *1265 has largely ignored the tribal court proceedings that preceded the filing of this case. I begin by providing additional relevant facts on these points.
Appellant is a New Mexico corporation with its principal place of business in Gallup, New Mexico. Appellant owns certain real property (the Property) in or near Cameron, Arizona (specifically described as Lots 2, 3, and 4 of Section 22, Township 29 North, Range 9 East of the Gila and Salt River Base and Meridian, Coconino County, Arizona). Appellant holds title to the Property in fee simple, and its title can be traced directly to a patent issued by the United States government. One of Appellant’s predecessors in title (Hubert Richardson) began business operations on the Property in 1916. Appellant currently operates several businesses on the Property, including a hotel, restaurant, cafeteria, gallery, curio shop, store, and RV park (the businesses are collectively known as the Cameron Trading Post).
The Nation is an Indian tribe with its reservation located in portions of Arizona, New Mexico, and Utah. In 1934, Congress extended the Nation’s reservation and, from that point forward, the Property has been surrounded on all sides by the' reservation. See Act of June 17, 1934, 48 Stat. 960. Thus, customers of Appellant’s businesses, including guests of its hotel, must travel through the reservation via U.S. Highway 89 and Arizona Highway 64 (both of which are maintained by the State of Arizona) to reach the Property.
On July 30, 1992, the Navajo Nation Council enacted the Hotel Occupancy Tax (HOT), 24 N.T.C. §§ 700-741, with an effective date of January 1, 1993. The HOT imposes a tax on all persons who pay for the use or possession of a room or space costing $2.00 or more per day in any hotel within the exterior boundaries of the Navajo Reservation. Owners and operators of hotels within the exterior boundaries of the Navajo Reservation are required to collect the tax from their guests, transmit the funds to the Navajo Tax Commission (NTC), and file reports with the NTC. The tax proceeds are allegedly “used to promote tourism and develop tourism-related projects in the Navajo Nation.” App. Vol. II, at 680.
On August 27, 1993, Appellant filed an action in the United States District Court for the District of New Mexico, seeking a declaratory judgment prohibiting application of the HOT to its hotel operation in Cameron, Arizona. That action was dismissed without prejudice on June 17, 1994, due to Appellant’s failure to exhaust available 'remedies within the administrative and judicial systems of the Navajo Nation. Atkinson Trading Co. v. Navajo Nation, 866 F.Supp. 506 (D.N.M.1994). Appellant did not appeal that ruling.
On July 22, 1994, Appellant began its trek through the Navajo Nation administrative and judicial systems by submitting a letter to the NTC objecting to application of the tax to rooms rented by Appellant on its property and requesting a refund “of all monies paid ... pursuant to this Tax.” App., Vol. 1, at 1. On September 20, 1994, Ronnye Etcitty, the Executive Director of the NTC, rejected Appellant’s request. Id. at 4-6. In the letter, Etcitty cited the following reasons why the challenged tax was applicable to Appellant’s guests:
[Appellant] employs at least thirty-five tribal members in its operations at Cameron. [Appellant] purchases Navajo made arts and crafts from members of the Navajo Nation. [Appellant’s] operations are significant users of water in the Cameron area. The Navajo Nation government provides police protection, fire protection and other governmental services to the residents and visitors of the area. The Court system of the Navajo Nation is available to [Appellant] to resolve disputes. The advantages of a civilized society are assured by the existence of the Navajo Nation government.
Id. at 4-5. Etcitty’s decision was subsequently affirmed by the NTC by a “Conference Decision” dated September 28, 1994. Id. at 7.
*1266 Appellant filed a notice of appeal from the NTC’s decision. Id. at 8. On July 24 and 25, 1995, the Navajo Nation Office of Hearing and Appeals held a hearing on Appellant’s appeal, at which time both Appellant and the Executive Director of the NTC presented witness testimony and other evidence. Id. at 107-392. On November 16, 1995, the NTC issued a written order concluding that Appellant was “subject to the Navajo Hotel Occupancy Tax laws for taxable periods commencing January 1, 1993, and [wa]s properly charged with the collection and remittance of the tax to the Office of the Executive Director of the Navajo Tax Commission.” Id. at 404. In support of its conclusion, the NTC noted that (1) Appellant benefitted from the governmental services provided generally to all persons within the exterior boundaries of the reservation, (2) Appellant’s activities and those of its guests had a direct effect on the political integrity, economic security, or health and welfare of the Navajo Nation because the Navajo Nation police, fire, and emergency service units had responded to emergency and non-emergency situations at or near the Property, and (3) the fact that Appellant had previously been determined by the Ninth Circuit to be an Indian trader “within the meaning of the applicable federal statute createfd] a presumption that its activities ha[d] a direct effect on the political integrity, economic security or health and welfare of the Navajo Nation.” Id. at 402. The NTC did not make any findings or reach any conclusions concerning whether a consensual relationship existed between the Nation and Appellant’s non-Indian guests.
Appellant appealed the NTC’s judgment to the Supreme Court of the Navajo Nation. On August 22, 1997, the Navajo Supreme Court affirmed the NTC’s decision. The details of that decision will be discussed below. Appellant subsequently filed this action in the United States District Court for the District of New Mexico. After allowing the parties to file cross-motions for summary judgment, the district court entered judgment in favor of defendants, essentially affirming the decision of the Navajo Supreme Court.
II.
It is true that this case arrives before us in the context of the district court’s grant of summary judgment. It must be remembered, however, that the district court’s ultimate task was to review the Navajo Supreme Court’s determination regarding tribal jurisdiction. See Mustang Production Co. v. Harrison, 94 F.3d 1382, 1384 (10th Cir.1996) (reviewing tribal court’s decision regarding tribal jurisdiction to impose severance tax on oil and gas produced from lands allotted to individual tribal members). For purposes of this appeal, our task is identical to that of the district court: we must determine whether the Navajo Supreme Court was correct in concluding that the Nation acted within its authority when it imposed the challenged tax. Id. In doing so, we review the tribal court’s conclusions of law de novo, and any underlying factual findings for clear error. Id.
III.
Because this case involves the Nation’s authority to regulate the conduct of nonmembers on alienated, non-Indian land within the boundaries of the reservation, it is clear that the analytical framework outlined in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and reaffirmed in Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), is the proper one to apply. Under that framework, we must first determine whether any applicable treaties or federal statutes afford the tribe such authority. If no such treaties or statutes exist, the tribe is presumed not to have civil authority over the nonmembers unless one of the two exceptions outlined in Montana is found to exist. Under these two exceptions, a tribe has- “inherent sovereign power to exercise some forms of civil jurisdiction over” nonmembers if (1) the nonmembers have in any way entered *1267 into a consensual relationship with the tribe through commercial dealing, contracts, leases, or other arrangements, or (2) the nonmembers’ conduct on fee land within the reservation has threatened or had some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. Strate, 520 U.S. at 446, 117 S.Ct. 1404.
Although the majority purports to apply the Montana framework, it makes several major missteps in doing so. To begin with, the majority mistakenly concludes it is irrelevant whether the nonmembers’ conduct takes place on tribal land or non-Indian fee land. See Maj. Op. at 1261 (“Our reading of Supreme Court precedent rejects the arbitrary factual basis of fee status as the determinative factor of the Montana standard....”). A proper reading of Montana and Strate indicates this distinction is, in fact, significant. Both cases involved nonmember conduct on nonmember fee land. At issue in Montana was the “power of the [Crow Tribe of Montana] to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe.” 450 U.S. at 557, 101 S.Ct. 1245. In Strate, the question was whether tribal courts could “entertain claims against nonmembers arising out of accidents on state highways” running through Indian reservations. 520 U.S. at 442, 117 S.Ct. 1404. Although these factual circumstances compelled the Court to utilize the above-outlined framework to resolve both cases, the Court indicated in both instances that its analysis would be different if the nonmember conduct had occurred on tribal land. For example, in Montana, the Court “readily agreefd]” with the lower court’s holding “that the Tribe [could] prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe.” 450 U.S. at 557, 101 S.Ct. 1245. Likewise, in Strate, the Court noted “that tribes retain considerable control over nonmember conduct on tribal land.” 520 U.S. at 454, 117 S.Ct. 1404. Further, before applying the Montana framework, the Court took great pains to establish that the land at issue was functionally equivalent to “land alienated to non-Indians,” id. at 456, 117 S.Ct. 1404, and it emphasized that the outcome of its Montana analysis had no bearing “on the governing law or proper forum when an accident occurs on a tribal road within a reservation.” Id. at 442, 1 S.Ct. 1404.
Any doubts on this point are negated when one considers the Court’s other post-Montana cases. In 1982, less than a year after Montana was issued, the Court decided Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), involving the authority of the Jiear-illa Apache Tribe to impose an oil and natural gas severance tax on nonmembers who had entered into long-term mineral leases of tribal land. With no mention of the Montana framework, the Court upheld the Tribe’s taxing power as an inherent attribute of tribal sovereignty. In doing so, the Court noted “that ‘[t]he power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status.’ ” Id. at 137, 102 S.Ct. 894 (quoting Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 152, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)) (emphasis added).
In 1989 and 1993, the Court returned to the Montana framework to decide, in Brendale v. Confederated Tribes and Bands of Yakima Nation, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), the Yakima Indian Nation’s authority to zone nonmembers’ land within the reservation, and, in South Dakota v. Bourland, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993), the Cheyenne River Sioux Tribe’s authority to- regulate hunting and fishing by non-Indians in an area located within the reservation but acquired by the United States for the operation of a dam and reservoir. In Brendale, a majority con- *1268 eluded that the Yakima Indian Nation lacked authority to zone nonmembers’ fee land within an area of the reservation open to the general public. 492 U.S. at 423-24, 109 S.Ct. 2994 (opinion of White, J.); id. at 444-45, 109 S.Ct. 2994 (opinion of Stevens, J.). In Bourland, the Court noted “that when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands.” 508 U.S. at 689, 113 S.Ct. 2309. “The abrogation of this greater right,” the Court indicated, likewise “implies the loss of regulatory jurisdiction over the use of the land by others.” Id. Under the facts before it, the Court concluded that when Congress acquired certain tribal land for the dam and reservoir project, it “eliminated the Tribe’s power to exclude non-Indians from these lands, and with that the incidental regulatory jurisdiction formerly enjoyed by the Tribe.” Id.
Ignoring these Supreme Court cases, the majority here relies on two unconvincing sources. First, the majority cites language from Buster v. Wright, 135 F. 947, 951 (8th Cir.1905), stating that “the jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it.” Although it is true that Buster was cited in Montana and Strate, the Court’s purpose in both instances was to provide an example of the first Montana exception relating to nonmembers who enter consensual relationships with a tribe.[1] 520 U.S. at 457, 117 S.Ct. 1404, 450 U.S. at 566, 101 S.Ct. 1245. In neither case did the Court approve of the language now relied upon by the majority. Indeed, it is clear from Montana, Strate, and the other post-Montana cases cited above that the quoted language from Buster is not an accurate statement of current federal law.[2] The second authority cited by the majority is 18 U.S.C. § 1151, which defines the term “Indian Country” to include “all land within the limits of any Indian reservation ... notwithstanding the issuance of any patent.” Although this definition is often relied upon in determining “the allocation of federal, tribal and state authority with respect to Indians and Indian lands,” Indian Country U.S.A. Inc. v. Oklahoma, 829 F.2d 967, 973 (10th Cir.1987), it has little, if any, bearing on tribal jurisdiction over nonmembers occurring on nonmember fee land within the boundaries of a reservation. For example, in Strate, the Court held that rights-of-way, which are specifically included in § 1151’s definition of “Indian country,” are to be treated (at least where a tribe has not retained the right to exercise dominion or control over the right-of-way) as non-Indian land for purposes of determining a tribe’s civil authority over non-Indians’ conduct occurring thereon. Further, in Montana, the Court acknowledged the existence of § 1151, but obviously rejected it as a statutory source of tribal jurisdiction over non-Indians on fee-patented lands. See 450 U.S. at 562, 101 S.Ct. 1245.
Based upon its mistaken conclusion that there is no distinction between fee land and tribal land for purposes of determining tribal jurisdiction over nonmembers, the majority in this case proceeds to modify the Montana framework with factors derived in large part from Merrion. In particular, the majority adopts and applies what it describes as a “balancing test” in which “ ‘the impact of the [nonmembers’] activity on the tribe [is balanced] with the severity of the tribe’s proposed regulation, taxation, or other imposition of jurisdic *1269 tion.’ ” Maj. Op. at 1258-59 (quoting R. Vol. Ill at 926). Among the key factors considered by the test are whether the tribe provides services to the nonmembers and whether the nonmembers otherwise benefit from “the advantages of a civilized society that are assured by the existence of [the] tribal government.” Merrion, 455 U.S. at 137-38, 102 S.Ct. 894 (internal quotations and citations omitted).
In my view, it is improper to modify the Montana framework with any language or “factors” derived from Merrion. Montana operates from a presumption that, absent express authority derived from a treaty or statute, a tribe lacks jurisdiction over nonmembers’ conduct on nonmember fee land. Only in those limited circumstances where a nonmember has entered into a consensual relationship with the tribe or its members, or where a nonmember’s conduct “threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe,” does a tribe possess inherent sovereign authority “to exercise civil authority over the conduct of non-Indians on fee lands within its reservation.... ” 450 U.S. at 566, 101 S.Ct. 1245; see also Strate, 520 U.S. at 446, 117 S.Ct. 1404 (“Montana ... described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers or non-Indian land within a reservation, subject to two exceptions.... ”). In contrast, Mer-rion operates from a presumption that a tribe retains inherent sovereign authority to regulate nonmembers’ conduct occurring on tribal land, and thus contains no particular “test” or “factors” for deciding tribal jurisdiction. The majority’s newly adopted test, which effectively blends the two cases, subverts the question of whether a consensual relationship exists between the nonmembers and the tribe and replaces it with an entirely different inquiry that, in my view, makes it substantially easier for a tribe to establish jurisdiction over a nonmember.
IV.
Because the majority has not, in my view, properly applied the Montana framework in deciding whether the Nation had authority to impose the HOT on Appellant’s non-Indian guests, I proceed to do so.

Existence of treaty or statute affording the Nation authority over Appellant’s guests

Although the Nation has never expressly relied on any treaty or federal statute to support its alleged authority to regulate Appellant’s non-Indian guests, the Navajo Supreme Court concluded that the 1868 Navajo Treaty, 15 Stat. 667 (June 1, 1868), afforded the Nation “sovereign authority over the exterior boundaries of its territory — then and now.” App., Vol. II at 685. The Navajo Supreme Court also suggested that this treaty afforded the Nation the authority to exclude Appellant’s non-Indian guests from passing through the reservation to reach Appellant’s property. Id. at 688, n. 8. Finally, the Navajo Supreme Court concluded that the federal Indian country statute, 18 U.S.C. § 1151 et seq., is “the measure of tribal civil authority.” Id. at 687.
The Navajo Supreme Court’s conclusions regarding the 1868 Treaty are clearly undercut by Montana. In Montana, the Supreme Court emphasized “that treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands.” 450 U.S. at 560, 101 S.Ct. 1245. Although the record in this case does not indicate precisely when the patent for the Property was issued, it appears to be undisputed that it occurred after the 1868 Navajo Treaty was enacted. Thus, the Treaty cannot be read as a statement of Congressional intent affording the Nation authority to regulate conduct occurring on the Property.
Likewise, the fact that the 1868 Treaty may have originally afforded the Nation the right to exclude non-Indians from traveling through the reservation does not, over 130 years later, afford the Nation any *1270 authority over Appellant’s non-Indian guests. It is uneontroverted that Appellant’s guests travel through the reservation via U.S. Highway 89 and Arizona Highway 64, both of which are maintained by the State of Arizona, to reach the property. Like the highway at issue in Strobe, both of these highways presumably represent rights-of-way granted by the Nation, and there is no evidence in the record that the Nation retained any right to exercise dominion or control over those highways. Accordingly, under Strate, the highways must be treated as non-Indian property for purposes of determining the Nation’s regulatory authority over Appellant’s non-Indian guests.
Finally, contrary to the conclusion reached by the Navajo Supreme Court, the Indian country statute does not provide Indian tribes with any civil authority over non-Indians on fee patent land. As previously explained, although fee patent land falls within the definition of the term “Indian country,” nothing in that statute grants tribes authority over non-Indians’ conduct on such land.
In conclusion, I find no treaty or federal statute that affords the Nation civil authority over Appellant’s non-member guests.[3] Accordingly, I proceed to determine whether either of the two Montana exceptions applies.

Consensual relationship between the Nation and Appellant’s guests

As previously stated, the first exception set forth in Montana to permit the Nation’s exercise of civil authority over Appellant’s non-member guests can arise out of a consensual relationship between the Nation and Appellant’s guests. Although the Nation does not point to any consensual relationship between itself and Appellant’s non-Indian guests,[4] the Navajo Supreme Court concluded that such a relationship existed. The Navajo Supreme Court based its finding on the following factors: (1) Appellant had “availed itself of the substantial privilege of carrying on business within Navajo Nation jurisdiction,” (2) Appellant “uses a Navajo Indian environment, including culture, Navajo employees, crafts, and other Navajo Indian trappings, to lure tourists to its facility for business purposes,” (3) “[wjhile on [Appellant’s] property, the [non-Indian] tourists are served by Navajo employees, who make up a majority of [Appellant’s] work force, to provide a distinctly Navajo flavor,” (4) “[suppliers enter and drive across the Navajo Nation to bring [Appellant] and its guests goods,” (5) Appellant had “purchased arts and crafts from Navajo tribal members and sales have been made to tribal members,” (6) Appellant and its non-Indian guests “receive and benefit from many modern Navajo Nation governmental services, or from the advantages of a civilized society that are assured by the Navajo Nation Government,” including police and fire protection, medical services, health protection, and tourism services. App. at 699-701.
In my view, at least half of these factors are irrelevant. Because it is uncontrovert-ed that the legal incidence of the HOT falls on Appellant’s guests, it is the relationship between those guests and the Nation that is important, not the relationship between Appellant and the Nation. Thus, even assuming, arguendo, there is some type of consensual relationship between Appellant and the Nation, that does not afford the Nation authority over Appellant’s guests. *1271 I therefore discount entirely the first, second, and fifth factors relied upon by the Navajo Supreme Court.
The evidence in the record does support the third factor cited by the Navajo Supreme Court. Specifically, the evidence indicates that the majority (75 to 80 percent) of Appellant’s employees are members of the Nation, and that Appellant’s non-Indian guests are routinely served by this group of employees.[5] See App., Vol. I at 191, 398. In my view, however, these facts in no way give rise to a consensual relationship between Appellant’s non-Indian guests and the Nation. It is a basic principle of agency law that a servant acting within the scope of his or her employment does so on behalf of the master. See Restatement (Second) of Agency §§ 1, 2 (1957). Thus, when one of Appellant’s Navajo employees performs a service for one of Appellant’s guests, he or she is acting as a representative of Appellant, not the Nation. To highlight my point, I note that if one of these same employees injures a guest while acting within the scope of his or her employment, it is Appellant, not the Nation, who is responsible for the injuries. See id. § 219(1); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 756, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (“An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment.”).
I fail to see the relevance of the fourth factor relied upon by the Navajo Supreme Court, i.e., that suppliers cross the reservation to bring supplies to Appellant and its guests. The evidence in the record indicates that, while guests[6] and suppliers actually travel inside the boundaries of the reservation to arrive at Appellant’s property, they do so via U.S. Highway 89 and Arizona Highway 64, both of which are maintained by the State of Arizona. In other words, Appellant’s suppliers and non-Indian guests travel on rights-of-way allocated to the federal government and the State of Arizona, and maintained by the State of Arizona, to arrive at Appellant’s fee patent land within the exterior boundaries of the Navajo Nation. Nothing from this conduct alone gives rise to a knowing and consensual relationship between Appellant’s guests and the Navajo Nation sufficient to afford the Nation the right to regulate Appellant’s guests. See Strate, 520 U.S. at 456-57, 117 S.Ct. 1404 (concluding there was no consensual relationship between tribe and parties involved in accident on highway that ran through reservation).
As for the Navajo Supreme Court’s conclusion that Appellant’s non-Indian guests “receive and benefit from many modern Navajo Nation governmental services, or from the advantages of a civilized society that are assured by the Navajo Nation Government,” I find little support for this conclusion in the record. Although the Nation provides law enforcement services to Appellant and its guests, the evidence indicates this is largely the result of agreements and understandings among the State of Arizona, the counties surrounding the reservation, and the Nation. Thus, when Appellant or its guests place a 911 call, it is first routed to state or county authorities outside the reservation who decide how to handle it. If and when the Nation’s law enforcement officers perform a task involving a non-Indian, they generally do so as officers of the State of Arizona, rather than the Nation. As for fire prevention services, the record indicates that the Nation’s fire department is available to assist in extinguishing any fires on Appellant’s property. However, the evidence indicates that the Nation’s fire department has, at most, reported to only *1272 one fire call from Appellant’s property, and there is no evidence that the fire involved or threatened Appellant’s guests.[7] Finally, there is no evidence that any of Appellant’s non-Indian guests have been provided medical[8], health protection[9], or tourism services by the Nation.
In the end, the evidence contained in the record is insufficient, in my view, to support the conclusion that a consensual relationship, either express or implied, exists between the Nation and Appellant’s non-Indian guests. I conclude the Nation cannot rely on the first Montana exception as authority to regulate Appellant’s non-Indian guests.

Effect on the Nation’s political integrity, economic security, or health and welfare

Again, although the Nation has not asserted any threat or direct effect from Appellant’s non-Indian guests on its political integrity, economic security, or health and welfare, the Navajo Supreme Court concluded that such a threat or direct effect existed and justified the exercise of tribal authority under the second Montana exception. Specifically, the Navajo Supreme Court concluded as follows:
Taxation, that indispensable element of any government, surely has everything to do with the Navajo Nation’s political integrity. A sovereign nation that cannot raise revenues to conduct governmental operations cannot function. Aside from the need to raise revenue to fund essential governmental services, (citation omitted), taxation is a method of business regulation. A hotel occupancy tax is utilized to determine and project the number of tourist visits each year. Funds are then channeled to those governmental programs which benefit tourists, including police and fire protection, medical treatment, health inspections, tourism information, tourist facilities, and others.
The economic security element is similar. The Navajo Nation is seeking self-reliance and economic security through taxation. The present national trend is to shift the financial obligations of governance and government services from the federal government to the states. Public services which were formerly provided by the federal government are now the states’ responsibility. The states can readily assume those obligations because of their strong tax bases. Unlike the states, the Navajo Nation just recently began building its tax base, and the hotel occupancy tax contributes to that foundation.
The Navajo Nation’s health and welfare interests are also implicated. The Navajo Nation assumed the responsibility of the Indian Health Service to assure public health in the form of housing code regulation, health inspections, and providing public health services to [Appellant’s] guests. The “welfare” interest is *1273-1283 used here in the sense of protecting the public welfare, as has been previously elaborated in this opinion.
The second Montana exception also implicates Indian nation police power.... Cameron, Navajo nation (Arizona) is not a “hole” within Navajo Nation territorial jurisdiction. The Navajo Nation has responsibilities to everyone who is present within its jurisdiction.
App. at 702-04.
As is apparent from the above-quoted language, the Navajo Supreme Court’s analysis is nonsensical. Nowhere does the court cite to any evidence demonstrating that the conduct, or even the mere presence, of Appellant’s non-Indian guests represents a threat to, or has a direct effect on, the Nation’s political integrity, economic security, or health and welfare. Instead, the court seems to suggest that the Nation’s desire for self-reliance, and its need for governmental funding, justifies the imposition of the HOT on Appellant’s non-member guests. This circular reasoning, which could arguably be used to justify any tax on non-Indians on fee patent land, does not satisfy the second Montana exception.
Neither the conduct nor presence of Appellant’s non-Indian guests threatens or affects the Nation’s ability to govern itself and its people. Nor has there been any showing that Appellant’s guests in any way threaten or affect the health and welfare of the Nation and its people. Perhaps the best argument that can be made is that the Nation’s limited provision of services to Appellant and its guests (e.g., police and fire protection) has a direct effect on the Nation’s economic security. More specifically, it is undoubtedly true that the provision of such services costs money and impacts the Nation’s budget. However, the evidence presented on this point was extremely limited, and it is impossible to conclude that the provision of such services threatens or directly affects the Nation’s economic security in such a fashion as to qualify for Montana’s second exception. See Strate, 520 U.S. at 459, 117 S.Ct. 1404 (suggesting that the second Montana exception is limited to situations where tribal regulatory or adjudicatory authority is needed to preserve the right of reservation Indians to make their own laws and be ruled by them); Brendale, 492 U.S. at 431, 109 S.Ct. 2994 (White, J.) (under the second Montana exception, “[t]he impact must be demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the tribe”).

Conclusion

For the reasons outlined above, I conclude the Nation does not have civil authority over Appellant’s non-Indian guests. In particular, there is no treaty or federal statute granting the Nation such authority, and the evidence contained in the record is insufficient to demonstrate the applicability of either of the two Montana exceptions. I would reverse and remand this case with directions to enter judgment in favor of Appellant.

. Presumably, the consensual relationship in Buster was formed when the nonmembers purchased tribal land and/or when they chose to transact business with the tribe and its members.

. The decision in Buster was also discussed in Merrion. 455 U.S. at 143, 102 S.Ct. 894. That discussion pointed out that a tribe's taxing authority does not derive solely from its power to exclude non-Indians from tribal lands. Nothing in this discussion undermines the distinction, recognized in Montana and Strate, between tribal land and fee land for purposes of determining tribal jurisdiction over nonmembers.

. The Nation has not argued, nor do I find, that any grant of regulatory authority can be derived from the fact that Congress enlarged the reservation in 1934 to completely surround Appellant's fee land.

. Like the majority, the Nation relies heavily on the Court’s decision in Merrion, and asserts that it possesses inherent sovereign power to tax all conduct occurring within the geographical boundaries of the reservation, including the conduct of Appellant’s non-Indian guests. Under Montana, however, it is clear that a tribe's inherent sovereign power to exercise civil jurisdiction over nonmember conduct occurring on nonmember fee land is strictly limited to situations in which one of the two Montana exceptions is found to exist. 450 U.S. at 565-66, 101 S.Ct. 1245.

. According to the record, Appellant's non-Indian guests do not, while on Appellant’s property, transact business with tribal members not employed by Appellant. App., Vol. I at 130.

. The record indicates that the majority of Appellant's non-Indian guests are tourists traveling to and from the Grand Canyon on tour buses. App., Vol. I at 127-29, 178-79, 395.

.The evidence regarding this single incident is sketchy. In particular, the evidence suggests that Appellant contacted the Arizona state police, and it is unclear whether it was the Nation's fire department or the Bureau of Indian Affairs' fire department that responded. App., Vol. I at 205-06. In any event, the evidence indicates Appellant has its own firefighting equipment and its maintenance personnel is trained to use the equipment. Id. at 136, 180. During a subsequent fire involving an employee housing unit, Appellant's employees extinguished the fire. Id. at 253. The Nation's fire department did not respond at all to that fire. I'd. at 180. Although one of the Nation's police officers apparently responded, the fire had been extinguished by the time he arrived. Id. at 253.

. Non-Indian guests seeking medical treatment are referred by Appellant to a medical facility in Flagstaff, Arizona, approximately 54 miles away from the Property. App., Vol. I at 126, 135, 180-81.

. The NTC found that "[a] variety of health services are offered to members and nonmembers by the Navajo Nation Division of Health, including health inspection of food vendors on all sites within the Navajo Nation.” App., Vol. I at 400. To the extent this finding implicates Appellant’s non-Indian guests, it is erroneous since there is no evidence in the record indicating that these health inspection services involved Appellant's operations, or otherwise benefitted Appellant's non-Indian guests.