**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 2 2000**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ATKINSON TRADING COMPANY, INC., a New Mexico corporation,

      Plaintiff - Appellant,

v.

JOE SHIRLEY, JR.; VICTOR JOE; DERRICK B. WATCHMAN; ELROY DRAKE; MEMBERS OF THE NAVAJO TAX COMMISSION; STEVEN C. BEGAY, Director of the Navajo Tax Commission,

      Defendants - Appellees.

No. 98-2247

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-97-1261-BB)**

---

William J. Darling (Margaret P. Armijo with him on the briefs) of William J. Darling & Associates, P.A., Albuquerque, New Mexico, for Plaintiff-Appellant.

Marcelino R. Gomez, Assistant Attorney General (Herb Yazzie, Attorney General of the Navajo Nation Department of Justice, with him on the brief), Window Rock, Navajo Nation (AZ), for Defendants-Appellees.

---

Before **EBEL**, **McKAY**, and **BRISCOE**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Plaintiff-Appellant is a non-Indian New Mexico corporation operating several businesses–including a hotel, restaurant, cafeteria, gallery, curio shop, retail store, and RV park–on property held in fee simple but completely surrounded by Navajo Nation Reservation trust lands. This case involves Appellant's challenge to a Hotel Occupancy Tax enacted by the Navajo Nation, Navajo Nation Code tit. 24, §§ 101-142 (1995), requiring persons (Appellant's guests in this case) to pay an eight percent tax on any room or space costing two dollars or more each day in a hotel which is located within the exterior boundaries of the Navajo Nation.[1] Id. at §§ 102-103. Appellant initiated its complaint against the tribe in 1993 in a declaratory judgment action brought in the United States District Court for the District of New Mexico. See Atkinson Trading Co. v. Navajo Nation, 866 F. Supp. 506, 507 (D.N.M. 1994). The court in that case dismissed the action without prejudice requiring that Appellant exhaust its remedies in the tribal system. See id. at 512-13. After receiving an adverse result

---

[1]We note that when Appellant first brought its challenge in 1993, the rate of the tax was five percent. As originally enacted in 1992, the Hotel Occupancy Tax assessed five percent of the price paid for a room but provided that "[o]n January 1, 1994, the rate of the tax imposed by this chapter will increase to eight percent." Navajo Nation Code tit. 24, § 103 (1995).

While the tax applies only to Appellant's guests, it requires that Appellant collect the tax, see id. §§ 104, 107, and provides a reimbursement for the costs of collecting. See id. § 109.

-2-

in the Navajo tribal system,[2] Appellant again brought a declaratory judgment action in the district court requesting a ruling that the Navajo Nation has no jurisdiction to impose its Hotel Occupancy Tax on Appellant's guests. <u>See</u> <u>Atkinson Trading Co. v. Gorman et al.</u>, No. 97-1261 BB/LFG (D.N.M. Aug. 21, 1998); R., Vol. III at 913. Appellant moved for trial de novo and summary judgment. The district court denied Appellant's motions and granted instead Appellees' cross-motion for summary judgment. <u>See</u> <u>id.</u> Appellant now appeals the district court's rulings. We exercise jurisdiction under 28 U.S.C. § 1291.

## I.

As a preliminary matter, we consider the district court's denial of Appellant's motion for trial de novo. Appellant argues that it should have received a new trial in the district court because the factual findings established in Appellant's appeal to the Navajo tribal system were not supported by the evidence and because the Navajo Supreme Court demonstrated bias in its

---

[2]The Navajo tribal code provides for appeal from the assessment of the Hotel Occupancy Tax. The prescribed procedure requires a first appeal to the Navajo Tax Commission and permits a second appeal to the Navajo Supreme Court which is empowered to affirm, reverse, remand, or modify a Commission action. <u>See</u> Navajo Nation Code tit. 24, § 131(A)-(B) (1995). The Commission concluded that Appellant was subject to the provisions of the tax, <u>see</u> R., Vol. I at 404, and the Supreme Court also ruled against Appellant, affirming the decision of the Commission. <u>See</u> R., Vol. II at 705.

proceedings. The standard of review for a district court's refusal to grant a new trial is abuse of discretion. See Unit Drilling Co. v. Enron Oil & Gas Co., 108 F.3d 1186, 1193 (10th Cir. 1997).

The district court applied the standard set forth in Mustang Production Co. v. Harrison, 94 F.3d 1382, 1384 (10th Cir. 1996), to Appellant's declaratory judgment action. In Mustang, we adopted the reasoning of the Ninth Circuit from FMC v. Shoshone-Bannock Tribes, 905 F.2d 1311, 1313-14 (9th Cir. 1990), and held that "when reviewing tribal court decisions on jurisdictional issues, district courts should review tribal courts' findings of fact for clear error and conclusions of law de novo." Mustang, 94 F.3d at 1384. Appellant complains that our holding was too deferential to decisions of tribal courts and argues that Mustang is no longer good law in light of the Supreme Court's decision in Strate v. A-1 Contractors, 520 U.S. 438 (1997). See Appellant's Br. at 36. Appellant asserts that Strate overruled the reasoning of National Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845 (1985), and, by implication, the reasoning of Mustang and FMC. See Appellant's Br. at 36.

Strate, however, reiterated the holding of National Farmers Union and specifically upheld its reasoning. In National Farmers Union, a Montana school district and its insurer brought an action in federal district court challenging a tribal court's assertion of jurisdiction over a personal injury action initiated

-4-

against the school district on behalf of an Indian minor. The Supreme Court ruled that federal courts have the authority to determine whether a tribal court has exceeded the limits of its jurisdiction, National Farmers Union, 471 U.S. at 853, but the Court instructed federal courts to follow a deferential exhaustion rule that gives examination of the jurisdictional question in the first instance to the tribal court. Id. at 856-57. The National Farmers Union exhaustion rule allows a party to challenge in federal court a tribal court's assertion of jurisdiction only after that party has exhausted the remedies available in the tribal court system. The Supreme Court explained the policy behind the rule: "Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination. That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." Id. at 856 (footnotes omitted). The Court reasoned that the rule would encourage tribal courts to explain "the precise basis for accepting jurisdiction" and "provide other courts with the benefit of their expertise . . . in the event of further judicial review." Id. at 857. The exhaustion rule would also promote "the orderly administration of justice . . . [that] will be served by allowing a full record to be developed in the Tribal Court" and would minimize the risks of a "procedural nightmare" like the one

then before the Court.  Id. at 856.[3]  Referring to policy considerations like these, our circuit adopted the Mustang standard of review for decisions of tribal courts. We find nothing in Strate to persuade us that the Supreme Court has changed the exhaustion rule or abandoned the reasoning behind it.  We therefore conclude that we need not reexamine our decision in Mustang.

At issue in Strate was "the adjudicatory authority of tribal courts over personal injury actions against defendants who are not tribal members."  Strate, 520 U.S. at 442.  The petitioners in Strate wanted the Court to distinguish Montana v. United States, 450 U.S. 544 (1981), and extend the holding of National Farmers Union to establish a sweeping boundless form of tribal jurisdiction over disputes involving nonmembers.  See Strate, 520 U.S. at 447. The Court declined to extend National Farmers Union, concluding instead that National Farmers Union and Montana were completely compatible.  See id. at 448.  Montana, the Court explained, addressed the larger "concept of 'inherent sovereignty'" and the bounds of tribal power which were at issue in Strate.  Id. at 453 (quoting Montana, 450 U.S. at 563).  The National Farmers Union decision and its deferential rule did "not expand or stand apart from Montana's instruction

---

[3]For a complete explanation of the "procedural nightmare" that developed, see National Farmers Union Ins. Co. v. Crow Tribe of Indians, 560 F. Supp. 213, 213-18 (D. Mont. 1983), *reversed* 736 F.2d 1320 (9th Cir. 1984), and National Farmers Union, 471 U.S. at 847-49.

-6-

on 'the inherent sovereign powers of an Indian tribe.'" Id. (quoting Montana, 450 U.S. at 565). The Strate Court set forth a general proposition that was "unremarkable" for the purposes of its holding but is actually central to the discussion at hand, that is, "where tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts.'" Id. at 453 (quoting Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18 (1987)) (alterations in original). Deference lies at the heart of the standard of review established in Mustang. Even the Strate Court recognized the deference that federal courts owe tribal courts. Significantly, Strate left intact the deferential reasoning of National Farmers Union and, by implication, the rationale of FMC and Mustang.

FMC and Mustang set forth a clearly erroneous standard of review for factual questions decided by the tribal courts. That standard is built upon the "traditional judicial policy of respecting the factfinding ability of the court of first instance," FMC, 905 F.2d at 1313, a policy with theoretical underpinnings similar to those articulated by the Supreme Court in National Farmers Union. See, e.g., National Farmers Union, 471 U.S. at 856 ("[T]he orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed."). The standard of review set forth in FMC and Mustang is de novo

for questions of law decided in the tribal system.  On that point, the FMC and Mustang courts expected that tribal courts would provide others "with the benefit of their expertise . . . in the event of further judicial review."  National Farmers Union, 471 U.S. at 857; see also FMC, 905 F.2d at 1313-14.  This standard "indicates that federal courts have no obligation to follow [the tribal courts'] expertise, but need only be guided by it."  FMC, 905 F.2d at 1314.  The rationale underlying the FMC and Mustang standards of review for factual and legal questions decided by the tribal courts still persuades us.  We conclude that Mustang is still good law and that the district court in this case did not err in applying the Mustang standard to the decisions of the Navajo Supreme Court and Navajo Tax Commission.

Appellant asserts that even if the Mustang standard is still good law the district court erred in its application of that standard because it did not apply the Mustang exception for unfair and biased Indian tribunals.[4]  Appellant argues in particular that the district court should have reviewed the factual findings of the Navajo Supreme Court de novo because the statements and findings expressed by

---

[4]Though Mustang did not speak to this exception explicitly, it is not difficult to extrapolate from our court's opinion that if a nonmember party exhausting its remedies within the tribal system faces a fundamental unfairness or bias against it, the district court ought not give clear error discretion to the tribal court's findings of facts in its review of the tribal court's decision.  See Mustang, 94 F.3d at 1384.

the tribal court illustrate the pervasive bias Appellant faced in the Navajo Nation's tribunal system. Appellant's Br. at 39-43. Appellant is primarily concerned with: (1) the Navajo Supreme Court's use of the term "lure" to suggest that Appellant improperly used "Navajo trappings" to attract tourists; (2) the court's unnecessary criticism of the congressional policy behind the General Allotment Act of 1887; and (3) the court's unfounded speculation as to why Appellant ceased hiring Navajos and buying wares from Navajo artisans shortly after it commenced this challenge to the Hotel Occupancy Tax. See R., Vol. II at 681-82, 684-85, 699. The district court treated these portions of the opinion as merely erroneous statements of the evidence–ignorable, refutable, and irrelevant as to whether the Hotel Occupancy Tax can be imposed upon Appellant's non-Indian customers.[5] See R., Vol. III at 915. The district court concluded that "even accepting [Appellant's] contention that the [Navajo Supreme Court's] opinion makes some erroneous statements of fact that are not supported by the evidence," it "does not come close to exhibiting the type of bias that would justify applying a different standard of review to the tribal court's decision." Id. at 916-17. Further, the district court noted that Appellant did not "contest any of the

_____

[5]With respect to the negative statements regarding the General Allotment Act and congressional policy surrounding it, the district court pointed out that those were "no more than restatements of a view held by many Indian and non-Indian scholars." R., Vol. III at 916.

essential facts found by the [Navajo Tax Commission] and relied on by the [Navajo] Supreme Court" and determined there was "no need for a *de novo* trial that would afford [Appellant] a second opportunity to contradict facts that it did not contest in the first proceeding." Id. at 916.  Based on our review of the record, including the opinion of the Navajo Supreme Court, we cannot say that the district court abused its discretion in failing to apply the Mustang exception for unfair and biased Indian tribunals and in denying Appellant's motion for a new trial.

## II.

We turn now to Appellant's primary contention–that the district court erred in granting Appellee's motion for summary judgment.[6]  "We review the grant or denial of summary judgment de novo, applying the same standards as the district court."  Habermehl v. Potter, 153 F.3d 1137, 1138 (10th Cir. 1998).

The district court ruled that the tribe's authority to impose the tax on Appellant's hotel guests who were not tribal members arose from the guests'

---

[6]Appellant also contends that the district court erred in denying its motion for summary judgment.  For reasons that will become apparent in our discussion of the district court's grant of Appellee's motion for summary judgment, we need not consider the court's denial of Appellant's motion.

-10-

consensual relationship with the tribe.[7]  The consensual relationship basis for tribal jurisdiction is an exception to a general rule limiting tribal jurisdiction over nonmembers; both the rule and the exception are detailed in Montana, 450 U.S. at 564-66.  In reaching its decision, the district court determined:  (1) that the hotel guests staying at Appellant's hotel had entered into a consensual relationship with the tribe; (2) the relationship entered into was relevantly related to the tax in question; and (3) the tax was not a disproportionate burden on Appellant's guests.  Appellant argues that it is Montana's rule that must apply and not its exception and that the district court erred in "creat[ing] a test that is different from that set forth in Montana and Strate."  Appellant's Br. at 8.  Because the primary dispute is whether the standard applied in this case is consistent with that set forth in Montana and Strate, we turn to this issue first.

**A.**

In Montana, the Supreme Court addressed the extent to which a tribe could exercise civil authority over non-Indians on lands owned in fee by non-Indians but located within the bounds of the tribe's reservation.  See Montana, 450 U.S. at 547.  The Court in that case held that the tribe could not prohibit non-Indians

---

[7]The Navajo Supreme Court came to the same conclusion in its consideration of Appellant's action.  See R., Vol. II at 701.

-11-

from hunting or fishing on fee lands within its reservation because "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Id. at 565. Continuing with its holding, however, the Montana Court noted, "To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." Id. The Court then set out two exceptions in which a tribe could exercise jurisdiction over non-Indians on its reservation. The first exception articulated by the Court permits a tribe to "regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." Id. The second exception allows tribes to exercise inherent sovereign power over the conduct of non-Indians on their reservations when that conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566. In Strate, the Supreme Court applied the Montana rule of inherent sovereignty and held that a tribal court could not entertain a claim between nonmembers arising out of an accident occurring on a public highway that ran through reservation land because the petitioners failed to show their claim qualified under one of Montana's two exceptions. Strate, 520 U.S. at 456-59. Strate recognized both the Montana rule and its exceptions, and it is the latest

example illustrating that a proper <u>Montana</u> analysis includes a discussion of whether one of the exceptions applies.

It is significant that we review the <u>Montana</u> standard in its entirety as we begin our disposition of this case. Importantly, a full understanding of the application of <u>Montana</u>'s exceptions requires special emphasis of the Court's own phrase that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, *even on non-Indian fee lands*." <u>Montana</u>, 450 U.S. at 565 (emphasis added). This phrase confirms that tribes may exercise their powers over nonmembers on non-Indian fee lands and clearly undermines the argument that the tribe lacks jurisdiction over Appellant's nonmember guests because Appellant's hotel is situated on fee land within the reservation. The explicit caveat for tribal jurisdiction over nonmembers *even on non-Indian fee lands* demonstrates that the Supreme Court did not intend that fee status should become the determining factor in cases involving the assertions of tribal sovereign power over nonmembers on the reservation.

The district court in the case at hand observed that "[i]n both <u>Montana</u> and <u>Strate</u>, the Supreme Court mentioned the tribes' right to tax certain activities as a matter of inherent sovereign power" but "limit[ed] this power by imposing conditions on it." R., Vol. III at 924. Because the Supreme Court had consistently included taxation in its discussion of the consensual relationship

-13-

exception to the <u>Montana</u> rule, the district court determined to analyze the Navajo

tribe's taxing authority under that exception.[8]  In its application of the consensual

relationship analysis from <u>Montana</u>, <u>Strate</u>, and other Supreme Court cases

involving tribal authority of nonmembers on the reservation, the district court also

reviewed <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130 (1982), which

addressed the scope of tribal taxing powers.

In <u>Merrion</u>, the Supreme Court upheld an oil and gas severance tax imposed

on non-Indian lessees extracting oil and natural gas from reservation deposits.

The Court reasoned that the lessees ought to be subject to the tribe's taxes

because they "avail[ed] themselves of the 'substantial privilege of carrying on

business' on the reservation" and "benefit[ted] from the provision of police

protection and other governmental services, as well as from '"the advantages of a

civilized society"' that are assured by the existence of tribal government."  <u>Id.</u> at

---

[8]The district court did not rule out the possibility that the power to tax might arise from the second "significant-impacts" exception to the <u>Montana</u> rule. In fact, the Navajo Supreme Court held as much, concluding that "[t]axation, that indispensable element of any government, surely has everything to do with the Navajo Nation's political integrity." R., Vol. II at 702.  The district court appeared to condone the Navajo Supreme Court's conclusion, stating that "[c]onsideration of the other half of the <u>Montana</u> test, the significant impacts factor, in an appropriate case may be sufficient to allow the tribe to impose its tax." R., Vol. III at 927 n.4.  In our review of the district court's opinion in this case, however, the applicability of the second exception to the <u>Montana</u> rule is not at issue.  We therefore do not address its application to the Navajo Hotel Occupancy Tax.

137-38 (citations omitted). The Court recognized that a tribe's power to tax "is an essential attribute of Indian sovereignty . . . [and a] necessary instrument of self-government and territorial management." Id. at 137. The Court explained further that a "tribe's interest in levying taxes on nonmembers to raise 'revenues for essential government programs . . . is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services.'" Id. at 138 (quoting Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 156-57 (1980)). In its review of Merrion in this case, the district court acknowledged that Merrion involved tribal, and not fee, lands on the reservation. The district court concluded, however, that Merrion's discussion was not necessarily limited to cases involving tribal lands because the Supreme Court characterized the tribe's authority to tax non-Indians doing business on the reservation as "an essential attribute of sovereignty" and not merely an extension of a tribe's power to exclude persons from its tribal lands. R., Vol. III at 924-25. Because the instant case involved a tax on commercial activity within reservation boundaries and because that tax was designed to sustain the tribe's services in support of the tourist market, the district court determined that the provision-of-services and benefits-of-a-civilized-society factors in Merrion would be relevant to its Montana consensual relationship analysis.

The district court also reviewed several other Supreme Court cases demonstrating the complexity of a proper Montana analysis, including Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408 (1989), Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163 (1989), and Colville, 447 U.S. at 156. In Brendale, a majority of Supreme Court justices recognized that a tribe's interest in zoning fee lands within a reservation became stronger as the impact of fee land activity on the tribe increased. See Brendale, 492 U.S. at 430-31 (opinion of White, J.), 437 & n.2 (opinion of Stevens, J.). In Cotton Petroleum, 490 U.S. at 186 & n.17, and Colville, 447 U.S. at 156, the Court considered the effects and burdens of state and tribal taxes, discussed the relationship between those taxes and the services provided by the tribe, and directed that lower courts seek to accommodate tribal, state, and federal interests in their analyses of tribal self-government and taxing issues.[9]

After reviewing Montana, Strate, Merrion, and the Supreme Court's other Indian jurisdiction case law, the district court determined that "the real question with respect to tribal-taxation cases and the consensual-relationships test is

_____

[9]The district court also referenced *Cohen's Handbook of Federal Indian Law* which characterized the Montana and Colville holdings as "recogniz[ing] that tribal power can extend to activities of nonmembers on fee lands [within the reservation] but only if there is a tribal interest sufficient to justify tribal regulation." Felix S. Cohen, Handbook of Federal Indian Law 256 (Rennard Strickland & Charles F. Wilkinson eds., 1982).

-16-

whether the nonmembers' consensual activity within Indian Country is significant enough to allow the tribe to tax that activity." R., Vol. III at 925. The district court described the test in such cases as "a sliding scale, balancing the impact of the activity on the tribe with the severity of the tribe's proposed regulation, taxation, or other imposition of jurisdiction." Id. at 926. As applied by the district court, that balancing test required an examination of "the nature of the relationship between [Appellant's] guests and the Tribe[] and the extent to which the Tribe provides services to those guests while they are on the reservation, compared to the burden placed on those guests by the [Hotel Occupancy Tax]." Id. We are convinced that the district court did not apply a standard to the Navajo Nation's Hotel Occupancy Tax that was different from the one set forth in Montana. We believe the balancing test and the factors discussed by the district court in its consensual relationship analysis appropriately apply and complement the Supreme Court's Indian law jurisprudence.

The district court did not discuss, however, what may be the most significant case illustrating the consensual relationship exception as it relates to tribal taxation of non-Indians on fee land–Buster v. Wright, 135 F. 947 (8th Cir. 1905). The Supreme Court cited Buster, an early Court of Appeals decision, in both Montana and Strate to illustrate a case in which a tribe may legitimately exercise its inherent sovereign powers to tax the activities of nonmembers who

-17-

enter consensual relationships with the tribe, even those occurring on non-Indian fee land within the reservation. See Montana, 450 U.S. at 566; Strate, 520 U.S. at 457. The consensual relationship holding in Buster involved merchants and traders who were deemed liable to pay taxes for exercising a taxable privilege—that of conducting business within the boundaries of the Creek Nation. See Buster, 135 F. at 949-50, 953-54. The relationship was consensual because the nonmember business owners could "refrain from the [privilege] and . . . [therefore] remain[] free from liability for the [tax]." Id. at 949. In its reasoning, the Buster court considered the fee status of the land belonging to those nonmember business owners, but, more importantly, the court "place[d] clearly before our minds the character of the Creek Nation and the nature of the power which it [was] attempting to exercise." Id. at 950. In the process of weighing the two positions (those of the nonmember business owners and the tribe), the court held that "the governmental power of a nation is not limited to the occupants of the lands in its country which the nation itself owns, but extends to all the inhabitants of its territory." Id. at 952.

The Eighth Circuit upheld the tax at issue in Buster because the tribe's "authority . . . to prescribe the terms upon which noncitizens may transact business within its borders" is "one of the inherent and essential attributes of its original sovereignty." Buster, 135 F. at 950. The fact that the business owners

-18-

within the borders of the Creek Nation owned their land in fee and the fact that the business transactions took place on fee land did not exempt the noncitizens from Indian jurisdiction. The court wrote that "the jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it." Id. at 951. It held that "the legal right to purchase land within an Indian nation gives the purchaser no right of exemption from the laws of such nation" and that "merchants and traders who had purchased or were occupying such lots were liable to pay the permit taxes of the tribe." Id. at 953-54.

Our review of Buster is significant because that case, with its explicit approval by the Supreme Court, clearly rebuts Appellant's primary argument that Montana, Brendale, South Dakota v. Bourland, 508 U.S. 679 (1993), Strate, and Merrion should be read to establish one rule for assertions of tribal jurisdiction on fee land (Montana, et al.) and another rule for tribal land (Merrion). The Supreme Court's use of Buster demonstrates that there is nothing inappropriate in reading those cases in harmony rather than cacophony.

The contrary reading of Supreme Court case law derives from an unwarranted reliance on a coincidence of facts and results detached from the reasoning of the Court. In the decisions noted above, the Court did make an issue of the fee status of the land in question. But nothing in them suggested that fee status is a limitation on the power to tax. The cases adverse to tribal jurisdiction

-19-

merely prohibited either the exclusive restrictions on the use of the land itself or the use of *lex loci* to establish Indian jurisdiction over a tort case between two nonmember parties that was otherwise unrelated to tribal interests. In Brendale , for example, the Yakima Tribe sought to enforce its tribal zoning ordinance upon nonmember fee land even though the tribe's ordinance conflicted with a county zoning ordinance covering the same property. See Brendale , 492 U.S. at 416. Reliance on one Brendale majority's conclusion that the Yakima Tribe "lacked authority to zone nonmembers' fee land within an area of the reservation open to the general public," see Dis. Op. at 8, overlooks the conclusion of a differently comprised Brendale majority holding that the Yakima Tribe could, in fact, impose its zoning regulation upon nonmember fee land in the area of the reservation closed to the general public. See Brendale , 492 U.S at 441-44 (opinion of Stevens, J.), 468 (opinion of Blackmun, J.). The comprehensive holding of Brendale demonstrates again how fee status is simply *one* factor a court should consider in applying the Montana framework and weighing the interests of the nonmembers against those of the tribe but not *the* determining factor. In Bourland , the Cheyenne River Sioux Tribe sought to prohibit hunters not holding tribal licenses from hunting on non-trust lands within the reservation. See Bourland , 508 U.S. at 685. The Supreme Court held that the treaty rights on which the tribe relied to assert exclusive jurisdiction had been abrogated.

-20-

However, the Bourland Court left for resolution on remand the issue as to whether a Montana exception could be invoked to give the tribe jurisdiction over non-Indians on non-trust lands within the reservation. See id. at 695-96. In Montana itself, the Court considered only the tribe's authority to prohibit all hunting and fishing by nonmembers on non-Indian property within reservation boundaries, and not the power to tax. See Montana, 450 U.S. at 547. While the Strate case did not involve the direct regulation of the use of nonmember fee land, the tribal court of the Three Affiliated Tribes in that case sought to assert jurisdiction over a tort claim between a nonmember plaintiff and nonmember defendants solely because the tort occurred within the boundaries of the reservation. See Strate, 520 U.S. at 447. The Strate Court distinguished its result from Buster by contrasting the nature of the consensual relationships that existed in the two cases; it did not distinguish the two cases with any reference to fee status. See id. at 457.

We acknowledge that the results in all four of these cases were adverse to the interests of Indian tribal jurisdiction. We believe, however, that the analysis set forth in these cases and others can be more accurately explained as instances in which the Supreme Court weighed the impact of the nonmember conduct against the severity of tribal regulations. This case-by-case approach seems clearly to have been the result the Montana Court intended when it held on the

-21-

one hand that the "inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers," but on the other hand that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, *even on non-Indian fee lands*." Montana, 450 U.S. at 565 (emphasis added).

Even in cases that were resolved favorably for the tribes, the Supreme Court did not indicate that its decision turned on the point of trust land status. In Merrion, for example, the Court ruled that the tribe had the authority to tax transactions occurring on trust land in part because those transactions "'significantly involv[ed]'" the tribe and its members and because "[t]he power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management [which] . . . enables a tribal government to raise revenues for its essential services." Merrion, 455 U.S. at 137 (discussing the holding in Colville, 447 U.S. at 152). In Colville, the Supreme Court upheld a cigarette tax imposed on non-Indian customers purchasing cigarettes on trust lands and used Buster (which involved transactions between tribal nonmembers occurring on fee lands) to note how "[f]ederal courts . . . have acknowledged tribal power to tax non-Indians entering the reservation to engage in economic activity." Colville, 447 U.S. at 153 (citing Buster, 135 F. at 950).

The direction provided by Congress on the issue also indicates a tribal jurisdiction standard that is not based on a distinction between fee and tribal lands. In 1948, Congress enacted 18 U.S.C. § 1151 which defined "Indian Country," and therefore the boundaries of Indian tribal jurisdiction, to include "all land within the limits of any Indian reservation . . . notwithstanding the issuance of any patent." See DeCoteau v. District County Court, 420 U.S. 425, 427 n.2 (1975). Although this definition was codified in the context of a primarily criminal statute, our circuit has held that "Indian tribes have jurisdiction over lands that are Indian country" and that § 1151, which defines Indian country, "applies to civil jurisdiction as well [as criminal jurisdiction]." Mustang, 94 F.3d at 1385 (citing DeCoteau, 420 U.S. at 427 n.2). In a 1962 case, the Supreme Court held that the enactment of § 1151 "squarely put to rest" the issue of whether land owned in fee fell outside tribal jurisdiction. Seymour v. Superintendent of Wash. State Pen., 368 U.S. 351, 357 (1962); see also Hagen v. Utah, 510 U.S. 399, 425-26 (1994) (Blackmun, J., dissenting) (noting that as a result of 18 U.S.C. § 1151, "[r]eservation boundaries, rather than Indian title, thus became the measure of tribal jurisdiction"); United States v. Baker, 894 F.2d 1144, 1149 (10th Cir. 1990) (quoting Seymour to settle the issue "whether private property owned by non-Indians but situated within the boundaries of an Indian reservation is still 'Indian country' for jurisdictional purposes"). For this reason,

the "chain of events that led to Appellant's land falling within the exterior boundaries of the [Navajo] Nation's reservation," Dis. Op. at 1, is essentially irrelevant. The key issue is the fact that the land is, without dispute, in Indian Country. Rather than support Appellant's artificial dichotomy, § 1151 clearly precludes it. There is simply no authority for the position that the timing of a fee patent makes any difference in designating land on the reservation as Indian Country. To the contrary, Congress, in the exercise of its plenary authority, has determined that all lands within the outer bounds of the reservation are within Indian Country and are therefore subject to reasonable tribal authority. [10]

Because the issue is settled as to whether fee lands within the exterior boundaries of the reservation fall under the jurisdiction of the tribe, the only issue involved in this case is whether the tribe's jurisdictional powers include the right to impose the tax at issue on nonmembers lodging on Appellant's fee lands. Because the power to tax derives from the inherent powers of the tribe, not from the tribe's power to exclude, the status of the land involved as fee land or tribal

[10]In fact, the Montana Court indicated that its decision to deny the Crow Tribe power to regulate hunting and fishing on fee lands within the reservation might have been different had the statute at issue incorporated a reference to § 1151. The Court stated, "If Congress had wished to extend tribal jurisdiction to lands owned by non-Indians [in its statute that prohibited unauthorized hunting, trapping, or fishing on tribal lands, 18 U.S.C. § 1165], it could have easily have done so by incorporating in § 1165 the definition of 'Indian country' in 18 U.S.C. § 1151." Montana, 450 U.S. at 563.

land is simply one of the factors a court should consider when determining whether a tax on nonmember activity on the reservation falls within the civil jurisdiction of the tribe.[11]  Cf., e.g., Brendale, 492 U.S. at 432, 441 (invalidating the tribe's assertion of exclusive zoning authority over fee lands in the "open" portion of the reservation because the proposed development in that area "d[id] not imperil any interest of the Yakima Nation," but granting the tribe exclusive zoning authority over fee lands within the "closed" portion of the reservation—i.e., that portion of the reservation closed to the general public—because the proposed development would endanger economically important timber production and threaten cultural and spiritual values of unique and undeveloped character of land).  Buster and Merrion use similar language and similar analysis in their consideration of tribal taxing powers on activity taking place on fee lands and tribal lands, demonstrating the soundness of the district court's conclusion in this case:  "[T]he extent to which a tribe will be allowed to regulate or affect non-Indian activity is often determined on a sliding scale,

---

[11]The dissent mistakenly asserts that our opinion "concludes it is irrelevant whether the nonmembers' conduct takes place on tribal land or non-Indian fee land." Dis. Op. at 6.  Our position is not that fee status is irrelevant.  Fee status is largely inconsequential in this case simply because the Navajo Hotel Occupancy tax is not a severe imposition upon Appellant's guests and because the subject matter of the tax was more a commercial transaction than one affecting the actual use of Appellant's land.  In sum, fee status is plainly relevant in applying the Montana standard and its exceptions, but it is not determinative to the extent that the analysis of the Supreme Court turns on that point alone.

balancing the impact of the activity on the tribe with the severity of the tribe's proposed regulation, taxation, or other imposition of jurisdiction." R., Vol. III at 926.

Contrary to the dissent's suggestion, see Dis. Op. at 9, the Supreme Court in Montana did not circumscribe the significance of its citation to Buster (with a parenthetical phrase, for example). The mere fact that the Court cited to page 950 of the Buster decision in no way implies that it did not approve of language from 951 of Buster holding that "the jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it." Buster, 135 F. at 951. The latter language is simply part of the same discussion that the Buster court began on page 950 to "place clearly before our minds the character of the Creek Nation and the nature of the power which it is attempting to exercise." Id. at 950.

In Strate, the Supreme Court made Buster's applicability abundantly clear by including parentheticals to explain its use of Buster and other cases to "indicate[] the type of activities the Court [in Montana] had in mind" when it expounded the first exception to the Montana rule. Strate, 520 U.S. at 457. The parenthetical in Strate explains that the Buster court "up[held] [the] Tribe's permit tax on nonmembers for the privilege of conducting business within [the] Tribe's borders" and "characterized as 'inherent' the Tribe's 'authority . . . to

prescribe the terms upon which noncitizens may transact business within its borders.'" Id. By pointing out both the consensual relationship between the tribe and nonmembers and the inherent qualities of a tribe's authority to tax in its use of Buster to illustrate the first exception to the Montana rule, the Supreme Court in Strate refutes the dissent's suggestion that Buster is applicable only to illustrate what constitutes a consensual relationship. Furthermore, the dissent fails to explain how Strate or other Supreme Court cases limit the authority at issue in Buster which the Court described as "inherent"–the authority "to prescribe the terms of business within its borders." Id.

Appellant attempts to distinguish Buster by arguing that the Creek Nation imposed its tax on nonmembers two years before the tribe "lost its unlimited sovereign power to regulate the conduct of nonmembers within its territory." Appellant's Reply Br. at 7. We reject this characterization of Buster. While the Creek Nation did enter into an agreement with the United States in 1901 to permit nonmembers to purchase lots within its territory, see Buster, 135 F. at 951, that agreement did not compromise the tribe's sovereignty. The Court in Buster noted, "The theory that the consent . . . to the conveyance of the title to lots or lands within [the tribal territory] . . . exempts the . . . owners or occupants of such lots from the exercise of all [the tribe's] governmental powers . . . is too unique or anomalous to invoke assent." Id. at 952.

In additional attempts to distinguish this case from <u>Buster</u>, Appellant argues that in <u>Buster</u> "the non-members doing business within the Creek territory had actually purchased the land on which they were doing business directly from the tribe" and "the non-members had been aware of the tax and expressly agreed to it when purchasing their property." Appellant's Reply Br. at 7-8. These arguments do not provide any grounds for distinguishing the case at hand, however. In response to the first point, we acknowledge that the nonmembers in <u>Buster</u> did purchase their lots directly from the Creek Nation upon approval by the Secretary of the Interior, whereas Appellant's land was granted to Appellant's predecessor by the United States government. While Appellant might plausibly construe these facts to argue that in <u>Buster</u> the nonmembers "were in the tribe's territory with the express permission of the tribe," <u>Id.</u> at 8, the difference is insignificant. The critical facts in <u>Buster</u> were that the nonmember businesses were located within the boundaries of the Creek Nation and had entered into a consensual relationship with the tribe by exercising the taxable privilege of trading within those boundaries. As we stated above, Congress extinguished any distinction we might draw between <u>Buster</u> and the case at hand first, in 1934 when it extended the boundaries of the Navajo reservation by congressional act to include Appellant's fee land, Act of June 14, 1934, ch. 521, 48 Stat. 960-62 (1934), and again, in 1948 when it defined Indian country to include "all land

-28-

within the limits of any Indian reservation . . . notwithstanding the issuance of any patent." 18 U.S.C. § 1151; see also Seymour, 368 U.S. at 357. For legal purposes, the nonmembers in Buster and the Appellant in this case are identically situated on fee land within the boundaries of the tribe's reservation.

Appellant's second point is more plainly mistaken. To support its contention that the nonmembers in Buster had been aware of the tax and expressly agreed to it when purchasing their property, Appellant cites Buster, 135 F. at 954. In that portion of the opinion, the court did discuss "contracting parties" who were aware of the tax before entering an express agreement on that point. Id. The parties spoken of, however, are not the nonmember businessmen and the tribe. Rather, they are the United States and the Creek Nation. See id. The agreement mentioned is the agreement of 1901 between the United States and the Creek Nation that opened the way for nonmembers to purchase fee lots, not an agreement between any individual nonmember merchant and the tribe. See id. The dissent appears to perpetuate this error by presuming that "the consensual relationship in Buster was formed when the nonmembers purchased tribal land and/or when they chose to transact business with the tribe and its members." Dis. Op. at 9 n.1. It is important to note, however, that the Buster court made no mention of any particular agreement, contract, or choice entered into by the nonmember businessmen constituting an express consensual relationship. In fact,

-29-

the only description of the consensual relationship given in Buster is that "[t]he payment of this tax is a mere condition of the exercise of th[e] privilege [of trading within the borders of the Creek Nation]." Buster, 135 F. at 949. The Buster court noted that "[n]o noncitizen is required to exercise the privilege or to pay the tax. He may refrain from the one and he remains free from liability for the other. . . . [The tax] has the optional feature of [a license] and lacks the compulsory attribute of [an ordinary tax]." Id. Indeed, the only mention of explicit consent in Buster was that the tribe did not forfeit their sovereign powers over nonmembers on fee land within its borders by consenting to incorporate cities and otherwise convey lots to those nonmembers. See id. at 952.

Buster's discussion of tribal sovereign powers is really no different from the Supreme Court's discussion in Montana and elsewhere. In 1831, the Supreme Court declared Indian people's status as "domestic, dependent nations." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17 (1831). Since that time, the tribes have remained distinct political entities, retaining their original sovereign authority to the extent Congress and the Supreme Court have permitted. See Montana, 450 U.S. at 565 (reviewing Supreme Court case law that stresses "that Indian tribes cannot exercise power inconsistent with their diminished status as sovereigns"); Buster, 135 F. at 950. This case is not distinguishable from Buster on the grounds that the tax in Buster was imposed in a time of unlimited

-30-

sovereign powers. Tribal sovereign powers have always had some limitation. The issue here is what those limits are, i.e., whether the Navajo Nation may impose its tax on the non-Indian guests visiting Appellant's hotel situated on fee land within the boundaries of the Navajo Reservation.

Montana and Strate mandate that we permit the Navajo Nation to tax Appellant's guests if the tax falls within the consensual relationship exception. Significantly, both cases cite Buster to illustrate the consensual relationship exception. See Montana, 450 U.S. at 566; Strate, 520 U.S. at 457. We are persuaded that the district court's analysis conforms to the Supreme Court's decisions in Montana, Strate, and Merrion, and is consistent with its citations of Buster.

Our reading of Supreme Court precedent rejects the arbitrary factual basis of fee status as the determinative factor of the Montana standard and leaves the Supreme Court's Indian law jurisprudence more cohesive and intelligible. The primary considerations that the Supreme Court has taken into account in cases involving tribal jurisdiction and nonmembers on the reservation are (1) the status and conduct of the nonmembers and (2) the nature of the inherent sovereign powers the tribe is attempting to exercise, its interests, and the impact that the exercise of the tribe's powers has upon the nonmember interests involved. Any accounting of fee status either falls into the Court's study of these factors or

becomes secondary. We therefore conclude that the district court was correct in applying the consensual relationship exception to the Navajo Nation's Hotel Occupancy Tax as applied to Appellant and its guests.[12] A review of the record as it supports the district court's application of facts to the three factors it derived from its <u>Montana</u> analysis will help illustrate our conclusion in this regard.

---

[12]Appellant argues that because the Hotel Occupancy Tax requires both Appellant and its guests to take certain actions, the Navajo Nation must establish jurisdiction over both Appellant and its guests. <u>See</u> Appellant's Br. at 15. While the Navajo Supreme Court held that under <u>Montana</u> the tribe had the authority both to impose its Hotel Occupancy Tax on Appellant's non-Indian guests and to require that Appellant collect and remit the tax, <u>see</u> R., Vol. II at 705, the district court applied its <u>Montana</u> rule analysis as if the only issue were the Nation's assertion of jurisdiction over Appellant's hotel guests. <u>See</u> R., Vol. III at 920, 929. The question is not really as significant as Appellant suggests. The district court found that the Nation had authority to impose the tax on the guests under the <u>Montana</u> consensual relationship test. We note simply that if there is a sufficient consensual relationship between the Nation and Appellant's guests, there is certainly a sufficient consensual relationship between the Nation and Appellant, which, as a corporation operating several businesses on the reservation, has a consensual relationship more explicit than its guests, benefits far more from the provision-of-services and benefits-of-a-civilized-society factors discussed by the district court, and is actually reimbursed for the costs of collecting the tax. <u>See</u> Navajo Nation Code tit. 24, § 109 (1995).

The district court did question the extent to which Appellant had standing to challenge the Hotel Occupancy Tax, noting that Appellant's standing was "not entirely clear." R., Vol. III at 919. The court reasoned, however, that because the Navajo Nation failed to raise the issue, it failed to give Appellant opportunity to establish standing in the factual record, and the court did not address the issue further. <u>Id.</u> at 919-20. Because the Navajo Nation requires Appellant to collect the tax and because those most affected are Appellant's guests, we have no reason to suppose that Appellant lacks standing.

**B.**

Appellant argues that even if the district court's review of the <u>Montana</u> rule and its exceptions were correct, the court erred in its application of the consensual relationship exception. More particularly, Appellant contends that the district court erred in concluding that a consensual relationship existed between the tribe and the hotel guests and in basing that conclusion at least partially on the grounds that the hotel guests drive on a public highway that passes over reservation land to reach Appellant's businesses on fee land within the reservation. <u>See</u> Appellant's Br. at 22, 24. Appellant's arguments are again mistaken.

The district court did consider in its consensual relationship analysis the fact that Appellant's guests travel by public highway onto the reservation in their visit to Appellant's establishments (also known as the Trading Post). R., Vol. III at 917, 927. If that were the only factor the district court took into consideration when making its determination, its conclusion would probably be foreclosed by the Supreme Court's holding in <u>Strate</u>. <u>See</u> <u>Strate</u>, 520 U.S. at 442 (holding that a tribal court may not entertain an action against a nonmember arising out of an accident occurring on a portion of a public highway that runs across the tribe's reservation). The district court, however, addressed several more significant aspects of the guests' relationship with the tribe. It discussed the extent of police, fire, emergency medical, and tourist services provided by the tribe to benefit

-33-

Appellant and its guests at the Trading Post.[13]  It ruled that by frequenting

_____

[13]Reviewing the Navajo Tax Commission's factual findings, the district court reported:

Plaintiff's customers travel on reservation land to reach the Trading Post, either on a federal highway or a state highway.  These highways pass over rights-of-way granted by the Tribe.  The highways are jointly patrolled by the Arizona state, and Navajo tribal, police, but the tribal police force is the primary provider of police protection to the Trading Post and the immediate vicinity.  A substation of the Tribe's Tuba City police department is located in Cameron [the town in which Appellant's Trading Post is located].  When a 911 call is placed from the Post, the call is referred to the tribal police for first response.  In addition, the Post has an alarm system that triggers calls to the tribal police.  That is, when the alarm goes off, the operator of the alarm system calls the tribal police, rather than a non-tribal law enforcement office, to request a response.  The Trading Post has a non-loitering policy, and tribal police enforce that policy by requiring juveniles and others that are "hanging out" to move off the Post's property.  Tribal police provide assistance to motorists on the highways leading to the Trading Post, including giving directions and changing flat tires.

Fire protection in the area of the Trading Post is provided jointly by the tribal fire department in Tuba City, located about 25 miles from Cameron; the Bureau of Indian Affairs ("BIA") fire department (also located in Tuba City); a fire department called the Timberline department that is located 45 miles from Cameron; and the Grand Canyon fire department, located over 50 miles from Cameron.  The tribal and BIA departments cooperate closely with each other, and provide the primary response to calls from the Cameron area.  There has been at least one fire at the Trading Post, to which the tribal fire department as well as the Timberline department responded.

Emergency medical services in the Cameron area are provided by a tribal entity called the Emergency Medical Services Department ("EMS").  EMS maintains two ambulances in Tuba City.  EMS

Appellant's businesses on the reservation, staying overnight, and otherwise taking

advantage of tribal services and the "establishment of a civilized society" on the

reservation, those subject to the Navajo Hotel Occupancy Tax had actually

entered into a consensual relationship with the tribe. See R., Vol. III at 927. In

support of its ruling, the district court cited an analogy from New Mexico state

law in which motorists driving in New Mexico are deemed to have given implied

consent to breath tests for alcohol. Id. (citing N.M. Stat. Ann. § 66-8-107

(Michie 1998)). While it does not address directly the issue of implied consent,

the court could also have cited New Mexico Statutes Annotated § 3-38-15 (Michie

1999 Supp.), which authorizes municipalities in New Mexico to impose an

occupancy tax for revenues on lodging within their municipality in part because

---

> responds to all calls from locations within the Navajo Nation, and
> has responded to numerous calls concerning automobile accidents in
> the Cameron area. The tribal police and fire departments have also
> received and responded to many auto accident calls in the area,
> involving both Navajos and non-Navajos. If the state police called
> Flagstaff emergency services instead of the tribal EMS, however, the
> Flagstaff unit would respond to the call.
>
> The Navajo Nation has a tourism department that provides
> information to prospective visitors over the telephone or through
> brochures. That department is also attempting to stimulate tourism
> by developing "vendor villages" in several locations on the
> reservation that receive heavy tourist use, including the Cameron
> area.

R., Vol. III at 917-19 (footnote omitted); see also R., Vol. I at 393, 397-401 (the
Navajo Tax Commission's findings of fact).

"[e]very vendor who is furnishing any lodgings within a municipality or county is exercising a taxable privilege." The state of Arizona (where Appellant's Trading Post is located) also levies a "transaction privilege tax" on transient lodging. Ariz. Rev. Stat. §§ 42-5008, -5010, -5070 (1999). The occupancy taxes authorized in Ariz. Rev. Stat. § 42-5010 and N.M. Stat. Ann. § 3-38-15 are applied to lodgers within Arizona and New Mexico municipalities in the same manner as the Navajo Hotel Occupancy Tax applies to Appellant's lodgers on the Navajo Reservation.

The Navajo Nation in the case at hand is taxing the guests of Appellant's hotel for the privilege of remaining on the reservation under the protection and accommodation of the services provided by the tribe. By enacting its Hotel Occupancy Tax, the Navajo Nation seeks to prescribe the terms of business between hotel owners and guests within its tribal borders. Cf. Strate, 520 U.S. at 457 (affirming Buster's holding that "the Tribe's 'authority . . . to prescribe the terms upon which noncitizens may transact business within its borders" was "'inherent'"). The consensual relationship between the guests and the tribe is one of implied consent, or privilege and tax, similar to that set forth in Buster: the consensual relationship exists in that the nonmember guests could refrain from the privilege of lodging within the confines of the Navajo Reservation and therefore remain free from liability for the Navajo Hotel Occupancy Tax. Cf. Buster, 135

-36-

F. at 949.

The district court's ruling with regard to the consensual relationship between the tribe and the hotel guests subject to the Hotel Occupancy Tax does not offend the Montana consensual relationship exception or other notions of justice. The Montana exception contemplates the fact that "commercial dealing . . . or other arrangements" may give rise to tribal jurisdiction under the consensual relationship exception. Montana, 450 U.S. at 565. In the case before us, the tribe accommodates the activity of Appellant and its guests on the reservation. That activity is relevantly related to the tribe's tax. We agree with the district court that, by making the trip to the reservation and staying overnight, "the guests voluntarily put themselves in the position of possibly needing assistance from tribal personnel. . . . In sum, the Tribe provides [Appellant's] overnight guests with the 'benefits of civilized society' while the guests are present, and the presence of the guests creates a greater need, both actual and potential, for tribal services." R., Vol. III at 927-28.

We conclude that the same principles apply as in those other cases in which hotel occupancy taxes have been subject to judicial review. See Noralyn O. Harlow, Annotation, Tax on Hotel-Motel Room Occupancy, 58 A.L.R.4th 274, 282 ("Hotel room occupancy taxes have been subject to a number of constitutional challenges which, with a few exceptions, have been rebuffed in the

courts."). As long as it does not appear that the hotel occupancy tax imposed by the tribe is an "arbitrary or capricious . . . exercise[] of legislative power" and as long as the "benefits received and the burdens imposed [are not] disproportionate," id. at 290-91, 297, a court may infer that by availing themselves of the services provided by the tribe, hotel occupants like those in this case enter into a consensual relationship with the tribe. See id. (reviewing cases holding that the imposition of a hotel occupancy tax does not "discriminate against nonresidents and therefore [does] not violate the equal protection clause of the Constitution" and is not an arbitrary or capricious exercise of legislative power so long as the benefits received and the burdens imposed are proportionate).

In the final step of its analysis, the district court considered "the extent to which the Tribe provides services to those guests while they are on the reservation, compared to the burden placed on those guests by the [Hotel Occupancy Tax]." R., Vol. III at 926. The court determined the burdens of the Navajo Nation's tax were "minimal" because "[u]nlike zoning restrictions or hunting and fishing regulations, which directly restrict nonmembers' ability to act or use their property in certain ways, the [Hotel Occupancy Tax] involves only the payment of a tax of 8% of the room rate." Id. at 928. In its discussion of zoning, fishing, and hunting regulations, the district court distinguished this case from the

factual scenarios of <u>Montana</u>, which involved a tribe's attempt to prohibit the hunting and fishing by nonmembers on fee land within the reservation, <u>see</u> <u>Montana</u>, 450 U.S. at 566, and <u>Brendale</u>, which involved a tribe's attempt to impose exclusive zoning authority over fee lands within "closed" and "open" portions of the reservation. <u>See Brendale</u>, 492 U.S. at 432, 441. We agree with the district court's analysis and hold that this tax is neither an arbitrary and capricious exercise of power nor a disproportionate burden on those paying the tax. <u>See id.</u> at 290-91.[14]

In the one case discussed in the A.L.R. report above in which a court found that the burden was disproportionate, a county had imposed an occupancy tax on all hotels in the surrounding municipalities to fund a city convention center. The court found that "the class taxed are afforded no benefits whatsoever, while being significantly burdened." <u>Allegheny County v. Monzo</u>, 500 A.2d 1096, 1104 (Pa. 1985). This is not so in the case at hand. The Navajo Hotel Occupancy Tax "is imposed for the purposes of promoting tourism and tourism development," a benefit to Appellant and its guests, and "to develop projects throughout the

---

[14]While several cases use various nomenclature to describe the precise nature of the tax in question, we do not find it necessary to construe the Navajo Hotel Occupancy Tax for purposes of our holding. <u>Cf.</u> Harlow, <u>supra</u>, 58 A.L.R.4th at 282 (noting that "[t]he variety of nomenclature reflects an equally diverse judicial view of the nature of the tax, which has been held under various circumstances to be a sales tax . . . a privilege tax . . . a license tax . . . an income tax . . . or an excise tax").

Navajo Nation." Navajo Nation Code tit. 24, § 142(A)-(B). The district court

noted that "the rate [of the Navajo Hotel Occupancy Tax] is lower than the

occupancy-tax rate imposed by many municipalities"[15] and observed that

Appellant "made no attempt to argue that there was a great disparity between the

amount of the tax paid and the services provided by the Tribe." R., Vol. III at

928. We are again persuaded by the district court's analysis. The burden

imposed on Appellant's guests is not disproportionate to the benefits they receive

by availing themselves of Navajo tribal services, including tourist services. The

Navajo Nation's tax is imposed on nonmembers who have entered an implied

consensual relationship with the tribe and is used in ways that appropriately

benefit the taxpayers.

We hold that as applied to Appellant's guests, the Navajo Hotel Occupancy

Tax falls under the consensual relationship exception of the Montana rule. The

---

[15]The district court appears to have made this conclusion based on a review of occupancy tax rates outside the states of New Mexico and Arizona. The statute authorizing municipalities in New Mexico to impose an occupancy tax limits that tax to "five percent of the gross taxable rent." N.M. Stat. Ann. § 3-38-15 (Michie 1999 Supp.). Arizona levies a five and one-half percent tax on transient lodging. See Ariz. Rev. Stat. § 42-5010(A)(2) (1999). Statutes in other states, however, authorize occupancy taxes at rates varying between one and fifteen percent. See, e.g., La. Rev. Stat. Ann. § 2740.18 (A)(1) (West 1999) (authorizing parishes to impose a one percent occupancy tax); Tex. Tax Code Ann. § 351.0025(b) (authorizing an occupancy tax up to fifteen percent of price paid for room) (West 1999); Vt. Stat. Ann. tit. 32, § 9242(c) (1998) (levying a tax of nine percent on occupancies in the state); Va. Code Ann. § 58.1-3819 (Lexis 1999) (authorizing more populated counties to impose an occupancy tax of up to five percent).

district court's rulings are AFFIRMED.

**No. 98-2247, <u>Atkinson Trading Co. v. Shirley</u>**

**BRISCOE, Circuit Judge, dissenting:**

I respectfully dissent. For the reasons outlined below, I conclude the Navajo Indian Nation lacks authority to impose the challenged Hotel Occupancy Tax on Appellant's non-Indian guests, and would reverse and remand with directions to enter judgment in favor of Appellant.

I.

Although the majority has recited a few of the historical facts giving rise to this dispute, it has downplayed the chain of events that led to Appellant's land falling within the exterior boundaries of the Nation's reservation. Further, the majority has largely ignored the tribal court proceedings that preceded the filing of this case. I begin by providing additional relevant facts on these points.

Appellant is a New Mexico corporation with its principal place of business in Gallup, New Mexico. Appellant owns certain real property (the Property) in or near Cameron, Arizona (specifically described as Lots 2, 3, and 4 of Section 22, Township 29 North, Range 9 East of the Gila and Salt River Base and Meridian, Coconino County, Arizona). Appellant holds title to the Property in fee simple, and its title can be traced directly to a patent issued by the United States government. One of Appellant's predecessors in title (Hubert Richardson) began business operations on the Property in 1916. Appellant currently operates several businesses on the Property, including a hotel,

restaurant, cafeteria, gallery, curio shop, store, and RV park (the businesses are collectively known as the Cameron Trading Post).

The Nation is an Indian tribe with its reservation located in portions of Arizona, New Mexico, and Utah. In 1934, Congress extended the Nation's reservation and, from that point forward, the Property has been surrounded on all sides by the reservation. See Act of June 17, 1934, 48 Stat. 960. Thus, customers of Appellant's businesses, including guests of its hotel, must travel through the reservation via U.S. Highway 89 and Arizona Highway 64 (both of which are maintained by the State of Arizona) to reach the Property.

On July 30, 1992, the Navajo Nation Council enacted the Hotel Occupancy Tax (HOT), 24 N.T.C. §§ 700-741, with an effective date of January 1, 1993. The HOT imposes a tax on all persons who pay for the use or possession of a room or space costing $2.00 or more per day in any hotel within the exterior boundaries of the Navajo Reservation. Owners and operators of hotels within the exterior boundaries of the Navajo Reservation are required to collect the tax from their guests, transmit the funds to the Navajo Tax Commission (NTC), and file reports with the NTC. The tax proceeds are allegedly "used to promote tourism and develop tourism-related projects in the Navajo Nation." App. Vol. II, at 680.

On August 27, 1993, Appellant filed an action in the United States District Court for the District of New Mexico, seeking a declaratory judgment prohibiting application of the HOT to its hotel operation in Cameron, Arizona. That action was dismissed without

-2-

prejudice on June 17, 1994, due to Appellant's failure to exhaust available remedies within the administrative and judicial systems of the Navajo Nation. <u>Atkinson Trading Co. v. Navajo Nation</u>, 866 F.Supp. 506 (D. N.M. 1994). Appellant did not appeal that ruling.

On July 22, 1994, Appellant began its trek through the Navajo Nation administrative and judicial systems by submitting a letter to the NTC objecting to application of the tax to rooms rented by Appellant on its property and requesting a refund "of all monies paid . . . pursuant to this Tax." App., Vol. 1, at 1. On September 20, 1994, Ronnye Etcitty, the Executive Director of the NTC, rejected Appellant's request. <u>Id.</u> at 4-6. In the letter, Etcitty cited the following reasons why the challenged tax was applicable to Appellant's guests:

> [Appellant] employs at least thirty-five tribal members in its operations at Cameron. [Appellant] purchases Navajo made arts and crafts from members of the Navajo Nation. [Appellant's] operations are significant users of water in the Cameron area. The Navajo Nation government provides police protection, fire protection and other governmental services to the residents and visitors of the area. The Court system of the Navajo Nation is available to [Appellant] to resolve disputes. The advantages of a civilized society are assured by the existence of the Navajo Nation government.

<u>Id.</u> at 4-5. Etcitty's decision was subsequently affirmed by the NTC by a "Conference Decision" dated September 28, 1994. <u>Id.</u> at 7.

Appellant filed a notice of appeal from the NTC's decision. <u>Id.</u> at 8. On July 24 and 25, 1995, the Navajo Nation Office of Hearing and Appeals held a hearing on

Appellant's appeal, at which time both Appellant and the Executive Director of the NTC presented witness testimony and other evidence. Id. at 107-392. On November 16, 1995, the NTC issued a written order concluding that Appellant was "subject to the Navajo Hotel Occupancy Tax laws for taxable periods commencing January 1, 1993, and [wa]s properly charged with the collection and remittance of the tax to the Office of the Executive Director of the Navajo Tax Commission." Id. at 404. In support of its conclusion, the NTC noted that (1) Appellant benefitted from the governmental services provided generally to all persons within the exterior boundaries of the reservation, (2) Appellant's activities and those of its guests had a direct effect on the political integrity, economic security, or health and welfare of the Navajo Nation because the Navajo Nation police, fire, and emergency service units had responded to emergency and non-emergency situations at or near the Property, and (3) the fact that Appellant had previously been determined by the Ninth Circuit to be an Indian trader "within the meaning of the applicable federal statute create[d] a presumption that its activities ha[d] a direct effect on the political integrity, economic security or health and welfare of the Navajo Nation." Id. at 402. The NTC did not make any findings or reach any conclusions concerning whether a consensual relationship existed between the Nation and Appellant's non-Indian guests.

Appellant appealed the NTC's judgment to the Supreme Court of the Navajo Nation. On August 22, 1997, the Navajo Supreme Court affirmed the NTC's decision. The details of that decision will be discussed below. Appellant subsequently filed this

-4-

action in the United States District Court for the District of New Mexico. After allowing

the parties to file cross-motions for summary judgment, the district court entered

judgment in favor of defendants, essentially affirming the decision of the Navajo

Supreme Court.

## II.

It is true that this case arrives before us in the context of the district court's grant of

summary judgment. It must be remembered, however, that the district court's ultimate

task was to review the Navajo Supreme Court's determination regarding tribal jurisdiction.

See Mustang Production Co. v. Harrison, 94 F.3d 1382, 1384 (10th Cir. 1996) (reviewing

tribal court's decision regarding tribal jurisdiction to impose severance tax on oil and gas

produced from lands allotted to individual tribal members). For purposes of this appeal,

our task is identical to that of the district court: we must determine whether the Navajo

Supreme Court was correct in concluding that the Nation acted within its authority when it

imposed the challenged tax. Id. In doing so, we review the tribal court's conclusions of

law de novo, and any underlying factual findings for clear error. Id.

## III.

Because this case involves the Nation's authority to regulate the conduct of

nonmembers on alienated, non-Indian land within the boundaries of the reservation, it is

clear that the analytical framework outlined in Montana v. United States, 450 U.S. 544

(1981), and reaffirmed in Strate v. A-1 Contractors, 520 U.S. 438 (1997), is the proper one

to apply. Under that framework, we must first determine whether any applicable treaties or federal statutes afford the tribe such authority. If no such treaties or statutes exist, the tribe is presumed not to have civil authority over the nonmembers unless one of the two exceptions outlined in Montana is found to exist. Under these two exceptions, a tribe has "inherent sovereign power to exercise some forms of civil jurisdiction over" nonmembers if (1) the nonmembers have in any way entered into a consensual relationship with the tribe through commercial dealing, contracts, leases, or other arrangements, or (2) the nonmembers' conduct on fee land within the reservation has threatened or had some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. Strate, 520 U.S. at 446.

Although the majority purports to apply the Montana framework, it makes several major missteps in doing so. To begin with, the majority mistakenly concludes it is irrelevant whether the nonmembers' conduct takes place on tribal land or non-Indian fee land. See Maj. Op. at 31 ("Our reading of Supreme Court precedent rejects the arbitrary factual basis of fee status as the determinative factor of the Montana standard . . . ."). A proper reading of Montana and Strate indicates this distinction is, in fact, significant. Both cases involved nonmember conduct on nonmember fee land. At issue in Montana was the "power of the [Crow Tribe of Montana] to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe." 450 U.S. at 557. In Strate, the question was whether tribal courts could "entertain claims against nonmembers arising

-6-

out of accidents on state highways" running through Indian reservations. 520 U.S. at 442. Although these factual circumstances compelled the Court to utilize the above-outlined framework to resolve both cases, the Court indicated in both instances that its analysis would be different if the nonmember conduct had occurred on tribal land. For example, in Montana, the Court "readily agree[d]" with the lower court's holding "that the Tribe [could] prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe." 450 U.S. at 557. Likewise, in Strate, the Court noted "that tribes retain considerable control over nonmember conduct on tribal land." 520 U.S. at 454. Further, before applying the Montana framework, the Court took great pains to establish that the land at issue was functionally equivalent to "land alienated to non-Indians," id. at 456, and it emphasized that the outcome of its Montana analysis had no bearing "on the governing law or proper forum when an accident occurs on a tribal road within a reservation." Id. at 442.

Any doubts on this point are negated when one considers the Court's other post-Montana cases. In 1982, less than a year after Montana was issued, the Court decided Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982), involving the authority of the Jicarilla Apache Tribe to impose an oil and natural gas severance tax on nonmembers who had entered into long-term mineral leases of tribal land. With no mention of the Montana framework, the Court upheld the Tribe's taxing power as an inherent attribute of tribal sovereignty. In doing so, the Court noted "that '[t]he power to tax transactions occurring

on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status.'" Id. at 137 (quoting Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 152 (1980)) (emphasis added).

In 1989 and 1993, the Court returned to the Montana framework to decide, in Brendale v. Confederated Tribes and Bands of Yakima Nation, 492 U.S. 408 (1989), the Yakima Indian Nation's authority to zone nonmembers' land within the reservation, and, in South Dakota v. Bourland, 508 U.S. 679 (1993), the Cheyenne River Sioux Tribe's authority to regulate hunting and fishing by non-Indians in an area located within the reservation but acquired by the United States for the operation of a dam and reservoir. In Brendale, a majority concluded that the Yakima Indian Nation lacked authority to zone nonmembers' fee land within an area of the reservation open to the general public. 492 U.S. at 423-24 (opinion of White, J.); id. at 444-45 (opinion of Stevens, J.). In Bourland, the Court noted "that when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands." 508 U.S. at 689. "The abrogation of this greater right," the Court indicated, likewise "implies the loss of regulatory jurisdiction over the use of the land by others." Id. Under the facts before it, the Court concluded that when Congress acquired certain tribal land for the dam and reservoir project, it "eliminated the Tribe's power to exclude non-Indians from these lands, and with that the incidental regulatory jurisdiction

-8-

formerly enjoyed by the Tribe." Id.

Ignoring these Supreme Court cases, the majority here relies on two unconvincing sources. First, the majority cites language from Buster v. Wright, 138 F. 947, 951 (8th Cir. 1905), stating that "the jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it." Although it is true that Buster was cited in Montana and Strate, the Court's purpose in both instances was to provide an example of the first Montana exception relating to nonmembers who enter consensual relationships with a tribe.[1] 520 U.S. at 457; 450 U.S. at 566. In neither case did the Court approve of the language now relied upon by the majority. Indeed, it is clear from Montana, Strate, and the other post-Montana cases cited above that the quoted language from Buster is not an accurate statement of current federal law.[2] The second authority cited by the majority is 18 U.S.C. § 1151, which defines the term "Indian Country" to include "all land within the limits of any Indian reservation . . . notwithstanding the issuance of any patent." Although this definition is often relied upon in determining "the allocation of federal, tribal and state authority with respect to Indians

---

[1] Presumably, the consensual relationship in Buster was formed when the nonmembers purchased tribal land and/or when they chose to transact business with the tribe and its members.

[2] The decision in Buster was also discussed in Merrion. 455 U.S. at 143. That discussion pointed out that a tribe's taxing authority does not derive solely from its power to exclude non-Indians from tribal lands. Nothing in this discussion undermines the distinction, recognized in Montana and Strate, between tribal land and fee land for purposes of determining tribal jurisdiction over nonmembers.

and Indian lands," <u>Indian Country U.S.A. Inc. v. Oklahoma</u>, 829 F.2d 967, 973 (10th Cir. 1987), it has little, if any, bearing on tribal jurisdiction over nonmembers occurring on nonmember fee land within the boundaries of a reservation.  For example, in <u>Strate</u>, the Court held that rights-of-way, which are specifically included in § 1151's definition of "Indian country," are to be treated (at least where a tribe has not retained the right to exercise dominion or control over the right-of-way) as non-Indian land for purposes of determining a tribe's civil authority over non-Indians' conduct occurring thereon.  Further, in <u>Montana</u>, the Court acknowledged the existence of § 1151, but obviously rejected it as a statutory source of tribal jurisdiction over non-Indians on fee-patented lands.  <u>See</u> 450 U.S. at 562.

Based upon its mistaken conclusion that there is no distinction between fee land and tribal land for purposes of determining tribal jurisdiction over nonmembers, the majority in this case proceeds to modify the <u>Montana</u> framework with factors derived in large part from <u>Merrion</u>.  In particular, the majority adopts and applies what it describes as a "balancing test" in which "'the impact of the [nonmembers'] activity on the tribe [is balanced] with the severity of the tribe's proposed regulation, taxation, or other imposition of jurisdiction.'"  Maj. Op. at 25-26 (quoting R. Vol. III at 926).  Among the key factors considered by the test are whether the tribe provides services to the nonmembers and whether the nonmembers otherwise benefit from "the advantages of a civilized society that are assured by the existence of [the] tribal government."  <u>Merrion</u>, 455 U.S. at 137-38

(internal quotations and citations omitted).

In my view, it is improper to modify the <u>Montana</u> framework with any language or "factors" derived from <u>Merrion</u>. <u>Montana</u> operates from a presumption that, absent express authority derived from a treaty or statute, a tribe lacks jurisdiction over nonmembers' conduct on nonmember fee land. Only in those limited circumstances where a nonmember has entered into a consensual relationship with the tribe or its members, or where a nonmember's conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," does a tribe possess inherent sovereign authority "to exercise civil authority over the conduct of non-Indians on fee lands within its reservation . . . ." 450 U.S. at 566; <u>see also</u> <u>Strate</u>, 520 U.S. at 446 ("<u>Montana</u> . . . described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers or non-Indian land within a reservation, subject to two exceptions . . . ."). In contrast, <u>Merrion</u> operates from a presumption that a tribe retains inherent sovereign authority to regulate nonmembers' conduct occurring on tribal land, and thus contains no particular "test" or "factors" for deciding tribal jurisdiction. The majority's newly adopted test, which effectively blends the two cases, subverts the question of whether a consensual relationship exists between the nonmembers and the tribe and replaces it with an entirely different inquiry that, in my view, makes it substantially easier for a tribe to establish jurisdiction over a nonmember.

IV.

-11-

Because the majority has not, in my view, properly applied the Montana framework in deciding whether the Nation had authority to impose the HOT on Appellant's non-Indian guests, I proceed to do so.

*Existence of treaty or statute affording the Nation authority over Appellant's guests*

Although the Nation has never expressly relied on any treaty or federal statute to support its alleged authority to regulate Appellant's non-Indian guests, the Navajo Supreme Court concluded that the 1868 Navajo Treaty, 15 Stat. 667 (June 1, 1868), afforded the Nation "sovereign authority over the exterior boundaries of its territory – then and now." App., Vol. II at 685. The Navajo Supreme Court also suggested that this treaty afforded the Nation the authority to exclude Appellant's non-Indian guests from passing through the reservation to reach Appellant's property. Id. at 688, n. 8. Finally, the Navajo Supreme Court concluded that the federal Indian country statute, 18 U.S.C. § 1151 et seq., is "the measure of tribal civil authority." Id. at 687.

The Navajo Supreme Court's conclusions regarding the 1868 Treaty are clearly undercut by Montana. In Montana, the Supreme Court emphasized "that treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands." 450 U.S. at 560. Although the record in this case does not indicate precisely when the patent for the Property was issued, it appears to be undisputed that it occurred after the 1868 Navajo Treaty was enacted. Thus, the Treaty cannot be read as a statement of

-12-

Congressional intent affording the Nation authority to regulate conduct occurring on the Property.

Likewise, the fact that the 1868 Treaty may have originally afforded the Nation the right to exclude non-Indians from traveling through the reservation does not, over 130 years later, afford the Nation any authority over Appellant's non-Indian guests. It is uncontroverted that Appellant's guests travel through the reservation via U.S. Highway 89 and Arizona Highway 64, both of which are maintained by the State of Arizona, to reach the property. Like the highway at issue in Strate, both of these highways presumably represent rights-of-way granted by the Nation, and there is no evidence in the record that the Nation retained any right to exercise dominion or control over those highways. Accordingly, under Strate, the highways must be treated as non-Indian property for purposes of determining the Nation's regulatory authority over Appellant's non-Indian guests.

Finally, contrary to the conclusion reached by the Navajo Supreme Court, the Indian country statute does not provide Indian tribes with any civil authority over non-Indians on fee patent land. As previously explained, although fee patent land falls within the definition of the term "Indian country," nothing in that statute grants tribes authority over non-Indians' conduct on such land.

In conclusion, I find no treaty or federal statute that affords the Nation civil

-13-

authority over Appellant's non-member guests.[3]  Accordingly, I proceed to determine

whether either of the two <u>Montana</u> exceptions applies.

*Consensual relationship between the Nation and Appellant's guests*

As previously stated, the first exception set forth in <u>Montana</u> to permit the Nation's

exercise of civil authority over Appellant's non-member guests can arise out of a

consensual relationship between the Nation and Appellant's guests.  Although the Nation

does not point to any consensual relationship between itself and Appellant's non-Indian

guests,[4] the Navajo Supreme Court concluded that such a relationship existed.  The Navajo

Supreme Court based its finding on the following factors: (1) Appellant had "availed itself

of the substantial privilege of carrying on business within Navajo Nation jurisdiction," (2)

Appellant "uses a Navajo Indian environment, including culture, Navajo employees,

crafts, and other Navajo Indian trappings, to lure tourists to its facility for business

purposes," (3) "[w]hile on [Appellant's] property, the [non-Indian] tourists are served by

---

[3]  The Nation has not argued, nor do I find, that any grant of regulatory authority can be derived from the fact that Congress enlarged the reservation in 1934 to completely surround Appellant's fee land.

[4]  Like the majority, the Nation relies heavily on the Court's decision in <u>Merrion,</u> and asserts that it possesses inherent sovereign power to tax all conduct occurring within the geographical boundaries of the reservation, including the conduct of Appellant's non-Indian guests.  Under <u>Montana,</u> however, it is clear that a tribe's inherent sovereign power to exercise civil jurisdiction over nonmember conduct occurring on nonmember fee land is strictly limited to situations in which one of the two <u>Montana</u> exceptions is found to exist.  450 U.S. at 565-66.

-14-

Navajo employees, who make up a majority of [Appellant's] work force, to provide a distinctly Navajo flavor," (4) "[s]uppliers enter and drive across the Navajo Nation to bring [Appellant] and its guests goods," (5) Appellant had "purchased arts and crafts from Navajo tribal members and sales have been made to tribal members," (6) Appellant and its non-Indian guests "receive and benefit from many modern Navajo Nation governmental services, or from the advantages of a civilized society that are assured by the Navajo Nation Government," including police and fire protection, medical services, health protection, and tourism services. App. at 699-701.

In my view, at least half of these factors are irrelevant. Because it is uncontroverted that the legal incidence of the HOT falls on Appellant's guests, it is the relationship between those guests and the Nation that is important, not the relationship between Appellant and the Nation. Thus, even assuming, arguendo, there is some type of consensual relationship between Appellant and the Nation, that does not afford the Nation authority over Appellant's guests. I therefore discount entirely the first, second, and fifth factors relied upon by the Navajo Supreme Court.

The evidence in the record does support the third factor cited by the Navajo Supreme Court. Specifically, the evidence indicates that the majority (75 to 80 percent) of Appellant's employees are members of the Nation, and that Appellant's non-Indian guests are routinely served by this group of employees.[5] See App., Vol. I at 191, 398. In my

_____

[5] According to the record, Appellant's non-Indian guests do not, while on

(continued...)

-15-

view, however, these facts in no way give rise to a consensual relationship between Appellant's non-Indian guests and the Nation. It is a basic principle of agency law that a servant acting within the scope of his or her employment does so on behalf of the master. See Restatement (Second) of Agency §§ 1, 2 (1957). Thus, when one of Appellant's Navajo employees performs a service for one of Appellant's guests, he or she is acting as a representative of Appellant, not the Nation. To highlight my point, I note that if one of these same employees injures a guest while acting within the scope of his or her employment, it is Appellant, not the Nation, who is responsible for the injuries. See id. § 219(1); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 756 (1998) ("An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment.").

I fail to see the relevance of the fourth factor relied upon by the Navajo Supreme Court, i.e., that suppliers cross the reservation to bring supplies to Appellant and its guests. The evidence in the record indicates that, while guests[6] and suppliers actually travel inside the boundaries of the reservation to arrive at Appellant's property, they do so via U.S. Highway 89 and Arizona Highway 64, both of which are maintained by the State of

---

[5](...continued)
Appellant's property, transact business with tribal members not employed by Appellant. App., Vol. I at 130.

[6] The record indicates that the majority of Appellant's non-Indian guests are tourists traveling to and from the Grand Canyon on tour buses. App., Vol. I at 127-29, 178-79, 395.

-16-

Arizona. In other words, Appellant's suppliers and non-Indian guests travel on rights-of-way allocated to the federal government and the State of Arizona, and maintained by the State of Arizona, to arrive at Appellant's fee patent land within the exterior boundaries of the Navajo Nation. Nothing from this conduct alone gives rise to a knowing and consensual relationship between Appellant's guests and the Navajo Nation sufficient to afford the Nation the right to regulate Appellant's guests. See Strate, 520 U.S. at 456-57 (concluding there was no consensual relationship between tribe and parties involved in accident on highway that ran through reservation).

As for the Navajo Supreme Court's conclusion that Appellant's non-Indian guests "receive and benefit from many modern Navajo Nation governmental services, or from the advantages of a civilized society that are assured by the Navajo Nation Government," I find little support for this conclusion in the record. Although the Nation provides law enforcement services to Appellant and its guests, the evidence indicates this is largely the result of agreements and understandings among the State of Arizona, the counties surrounding the reservation, and the Nation. Thus, when Appellant or its guests place a 911 call, it is first routed to state or county authorities outside the reservation who decide how to handle it. If and when the Nation's law enforcement officers perform a task involving a non-Indian, they generally do so as officers of the State of Arizona, rather than the Nation. As for fire prevention services, the record indicates that the Nation's fire department is available to assist in extinguishing any fires on Appellant's property.

-17-

However, the evidence indicates that the Nation's fire department has, at most, reported to only one fire call from Appellant's property, and there is no evidence that the fire involved or threatened Appellant's guests.[7]  Finally, there is no evidence that any of Appellant's non-Indian guests have been provided medical[8], health protection[9], or tourism services by the Nation.

In the end, the evidence contained in the record is insufficient, in my view, to support the conclusion that a consensual relationship, either express or implied, exists between the Nation and Appellant's non-Indian guests.  I conclude the Nation cannot rely on the first Montana exception as authority to regulate Appellant's non-Indian guests.

---

[7]  The evidence regarding this single incident is sketchy.  In particular, the evidence suggests that Appellant contacted the Arizona state police, and it is unclear whether it was the Nation's fire department or the Bureau of Indian Affairs' fire department that responded.  App., Vol. I at 205-06.  In any event, the evidence indicates Appellant has its own firefighting equipment and its maintenance personnel is trained to use the equipment.  Id. at 136, 180.  During a subsequent fire involving an employee housing unit, Appellant's employees extinguished the fire.  Id. at 253.  The Nation's fire department did not respond at all to that fire.  Id. at 180.  Although one of the Nation's police officers apparently responded, the fire had been extinguished by the time he arrived.  Id. at 253.

[8]  Non-Indian guests seeking medical treatment are referred by Appellant to a medical facility in Flagstaff, Arizona, approximately 54 miles away from the Property.  App., Vol. I at 126, 135, 180-81.

[9]  The NTC found that "[a] variety of health services are offered to members and non-members by the Navajo Nation Division of Health, including health inspection of food vendors on all sites within the Navajo Nation."  App., Vol. I at 400.  To the extent this finding implicates Appellant's non-Indian guests, it is erroneous since there is no evidence in the record indicating that these health inspection services involved Appellant's operations, or otherwise benefitted Appellant's non-Indian guests.

*Effect on the Nation's political integrity, economic security, or health and welfare*

Again, although the Nation has not asserted any threat or direct effect from Appellant's non-Indian guests on its political integrity, economic security, or health and welfare, the Navajo Supreme Court concluded that such a threat or direct effect existed and justified the exercise of tribal authority under the second <u>Montana</u> exception. Specifically, the Navajo Supreme Court concluded as follows:

> Taxation, that indispensable element of any government, surely has everything to do with the Navajo Nation's political integrity. A sovereign nation that cannot raise revenues to conduct governmental operations cannot function. Aside from the need to raise revenue to fund essential governmental services, (citation omitted), taxation is a method of business regulation. A hotel occupancy tax is utilized to determine and project the number of tourist visits each year. Funds are then channeled to those governmental programs which benefit tourists, including police and fire protection, medical treatment, health inspections, tourism information, tourist facilities, and others.
>
> The economic security element is similar. The Navajo Nation is seeking self-reliance and economic security through taxation. The present national trend is to shift the financial obligations of governance and government services from the federal government to the states. Public services which were formerly provided by the federal government are now the states' responsibility. The states can readily assume those obligations because of their strong tax bases. Unlike the states, the Navajo Nation just recently began building its tax base, and the hotel occupancy tax contributes to that foundation.
>
> The Navajo Nation's health and welfare interests are also implicated. The Navajo Nation assumed the responsibility of the Indian Health Service to assure public health in the form of housing code regulation, health inspections, and providing public health services to [Appellant's] guests. The "welfare" interest is used here in the sense of protecting the public welfare, as has been previously elaborated in this opinion.
>
> The second Montana exception also implicates Indian nation police power. . . . Cameron, Navajo nation (Arizona) is not a "hole" within Navajo Nation territorial jurisdiction. The Navajo Nation has responsibilities to

-19-

everyone who is present within its jurisdiction.

App. at 702-04.

As is apparent from the above-quoted language, the Navajo Supreme Court's analysis is nonsensical. Nowhere does the court cite to any evidence demonstrating that the conduct, or even the mere presence, of Appellant's non-Indian guests represents a threat to, or has a direct effect on, the Nation's political integrity, economic security, or health and welfare. Instead, the court seems to suggest that the Nation's desire for self-reliance, and its need for governmental funding, justifies the imposition of the HOT on Appellant's non-member guests. This circular reasoning, which could arguably be used to justify any tax on non-Indians on fee patent land, does not satisfy the second Montana exception.

Neither the conduct nor presence of Appellant's non-Indian guests threatens or affects the Nation's ability to govern itself and its people. Nor has there been any showing that Appellant's guests in any way threaten or affect the health and welfare of the Nation and its people. Perhaps the best argument that can be made is that the Nation's limited provision of services to Appellant and its guests (e.g., police and fire protection) has a direct effect on the Nation's economic security. More specifically, it is undoubtedly true that the provision of such services costs money and impacts the Nation's budget. However, the evidence presented on this point was extremely limited, and it is impossible to conclude that the provision of such services threatens or directly affects the Nation's

-20-

economic security in such a fashion as to qualify for <u>Montana</u>'s second exception.  <u>See</u> <u>Strate</u>, 520 U.S. at 459 (suggesting that the second <u>Montana</u> exception is limited to situations where tribal regulatory or adjudicatory authority is needed to preserve the right of reservation Indians to make their own laws and be ruled by them); <u>Brendale</u>, 492 U.S. at 431 (White, J.) (under the second <u>Montana</u> exception, "[t]he impact must be demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the tribe").

*Conclusion*

For the reasons outlined above, I conclude the Nation does not have civil authority over Appellant's non-Indian guests.  In particular, there is no treaty or federal statute granting the Nation such authority, and the evidence contained in the record is insufficient to demonstrate the applicability of either of the two <u>Montana</u> exceptions.  I would reverse and remand this case with directions to enter judgment in favor of Appellant.